Johannes R. **KRAHMER** and Betty
P. Krahmer, Petitioners,

v.

**CHRISTIE'S INCORPORATED,**
Respondent.

C.A. No. 606–N.

Court of Chancery of Delaware,
New Castle County.

Submitted: March 22, 2006.

Decided: June 2, 2006.

 

Victor F. Battaglia, Sr., Biggs and Battaglia, Wilmington, DE, for the Petitioners.

Melanie K. Sharp, Seth J. Reidenberg, Young Conaway Stargatt & Taylor, L.L.P., Wilmington, DE; Michael E. Salzman, Russell W. Jacobs, Hughes Hubbard & Reed, L.L.P., New York City, for the Respondent.

## *OPINION*

LAMB, Vice Chancellor.

The purchasers of a painting acquired at auction in 1986 seek to amend their petition for rescission filed against the auction house. The original petition, filed in 2004, alleges that the auction house committed fraud by intentionally concealing that the work of art was not an original. Now, after the conclusion of discovery, the petitioners wish to add claims of mutual mistake of fact, negligent misrepresentation, and/or constructive fraud. The court finds that the proposed new causes of action are barred by the applicable statute of limitations, and that the proposed amendment fails to state a claim of negligent misrepresentation as a matter of law. Therefore, the motion to amend the petition must be denied.

---

1. The facts recited in this opinion are taken from the well pleaded allegations of the petition for rescission, unless otherwise noted, and are presumed to be true for the purposes of this motion.

## I.

### A. *Facts*

In May 1986, defendant Christie's, Inc., a well known auction house, first offered for sale a painting by Frank Weston Benson, representing the painting's provenance as a "midwestern club."[1] Initially, no buyer was found. On December 5, 1986, at a subsequent sale, the petitioners, Johannes R. Krahmer and Betty P. Krahmer, purchased the painting for $38,500. At the time of the purchase, the Krahmers had no reason to doubt that the painting was a genuine work of art by Benson. Although Christie's had removed its representation as to the paintings provenance from the catalogue, after the Krahmers purchased the painting, Christie's gave them a nameplate which stated that the painting belonged to the Detroit Club of Michigan. Moreover, Christie's told the Krahmers that the Detroit Club purchased the painting directly from the artist. Four years later, in 1990, Christie's provided the Krahmers with an updated appraisal of the painting, confirming its authenticity and raising the value of the painting to $85,000.

In the 1990s, the Krahmers began researching the painting, and, in the fall of 1999, they wrote to the Catalogue Raisonné Committee for Benson's paintings to have the painting listed as authentic.[2] The Krahmers learned that another Benson painting of the same subject was in the collection of the New Britain (Connecticut) Art Museum. When the Krahmers brought this to the attention of the Catalogue Raisonné Committee, they were advised that there might be two finished works by Benson. "The Committee did not suggest that the painting might not be

---

2. The Catalogue Raisonné Committee for Benson's paintings is headquartered at Vose Galleries in Boston, Massachusetts.

genuine, nor did the Krahmers contemplate that possibility." [3]

In the spring of 2002, the Krahmers attempted to sell the painting at Sotheby's auction house. Sotheby's sent the painting to a restorer to assess its condition. The restorer issued an analysis on September 26, 2002, expressing concern that the painting was not authentic.[4] Allegedly, for the first time, the Krahmers suspected that the painting might not be a genuine work by Benson.[5] The Krahmers informed Christie's of this newfound suspicion, and the parties agreed to have the Benson Catalogue Raisonné Committee determine the painting's authenticity.

The Committee issued a report on October 20, 2003, opining that the painting was a fake. Specifically, the Committee reported that after comparing the Krahmers' painting to the similar painting at the New Britain Museum, it determined that the painting at the New Britain Museum was more consistent with Benson's style. According to the Committee, the Krahmers' painting did not bear the hallmarks of Benson's work.[6]

Furthermore, the Committee found that in 1913 Benson exhibited the painting at the 19th Annual Exhibition of Paintings at Poland Springs, Maine. In the exhibition catalogue, upon close examination, there was a pearl necklace around the neck of the model. That necklace was missing in the Krahmers' painting and appeared in the New Britain Museum painting. Benson also purportedly exhibited the painting at the First Annual Art Exhibition of the Detroit Club in 1914. The Committee believed that the Detroit Club purchased the painting at that exhibition. These determinations were confirmed by the Benson Archives at the Peabody Essex Museum in Salem, Massachusetts, which had a photograph of the painting with the words "Detroit Club" purportedly written by Benson on it. In this photograph, the model in the painting had a pearl necklace around her neck.

The Committee opined that the painting was sold to the Detroit Club and then came into the hands of Donald Purdy by 1973, whereupon it was purchased from Purdy for the New Britain Museum. Essentially, the Committee believed that at some point during this time period, the painting was removed from its frame at the Detroit Club, swapped with a forgery, and eventually the original was sold to the New Britain Museum. Therefore, while the Krahmers' painting was a forgery, it was possible that it was placed in the frame of the authentic painting.

After learning that their painting may not be a genuine work of art by Benson, the Krahmers asked Christie's to rescind the December 1986 sale. Christie's refused, reasoning that its six-year warranty of authenticity on the painting had long ago expired and that no other basis for rescission existed.[7] On July 29, 2004, the Krahmers filed this petition for rescission.

---

3. Pet. for Rescission ¶ 10.

4. *Id.* at ¶ 12. Sotheby's declined to accept the painting for sale.

5. *Id.*

6. Pet. for Rescission Ex. G. The committee found that the light on the curtain at left was hard, the color unnaturally bright, the depiction of the sculpture on the table was awkward and its modeling very primitive, the right hand of the figure was very poorly modeled, the features of the woman's face were messy and ill defined, and the handling of the reflection in the mirror was wooden and unnatural. In addition, the committee found that the signature was stiff and unlike any other signatures by Benson.

7. The Krahmers were given a catalogue of the paintings for sale prior to the auction. The catalogue conspicuously informed the Krahmers that there was a six-year warranty of authenticity for the painting.

## B. The Krahmers' Allegation Of Fraud

The Krahmers allege in their original complaint that Christie's fraudulently misled them to believe that the painting they purchased was a true Benson. Specifically, they allege that, after the painting did not sell in the May 1986 auction, Christie's reviewed its file and confirmed that the painting had not been consigned to it for sale by the Detroit Club, but rather by Purdy or someone in privity with him.[8] Therefore, they claim, Christie's became concerned that the painting it had for sale was not an authentic Benson, but rather a fake painting in the original frame. Allegedly, to conceal the true nature of the painting, Christie's removed from its catalogue the representation that it was the property of a mid-western club and detached the nameplate identifying the painting as belonging to the Detroit Club. After the Krahmers purchased the painting, however, Christie's gave the Krahmers the nameplate and represented that the painting was a Benson purchased directly from the artist by the Detroit Club.[9] According to the Krahmers, Christie's "intentional misrepresentation of the authenticity of the painting, and its subsequent appraisal of the painting at more than twice the amount of petitioner's purchase price, constituted fraud."[10]

## C. Motion to Amend

After the parties exchanged written discovery, including interrogatories, requests for admissions and documents, and took several depositions, the Krahmers moved to amend their complaint to include allegations of mutual mistake of fact, negligent misrepresentation, and constructive fraud.[11] These proposed amendments contain no new factual allegations, but merely claim relief on the basis of misrepresentation without the scienter required in a fraud claim. The parties submitted briefs on this motion to amend, and argument was held on March 22, 2006.

## II.

Delaware Court of Chancery Rule 15(a) permits amendment of a petition after an answer has been filed "only by leave of court or by written consent of the adverse party." Leave to amend should be liberally and "freely given when justice so requires."[12] This decision, however, is a matter for the discretion of the trial judge.[13] In exercising this discretion, "the motion to amend must be denied if, after

---

8. The Krahmers allege that "there can be no doubt that respondent knew that the Detroit Club was not the consignor of the painting." Pet. for Rescission ¶ 18.

9. Allegedly, Christie's concocted a story that the nameplate had been removed from the frame during the viewing period because the chief shareholder of Sotheby's was a member of the Detroit Club and would be embarrassed if it was known that he was auctioning one of its paintings at Christie's. Pet. for Rescission ¶ 6.

10. Pet. for Rescission ¶ 20.

11. The Krahmers added two counts to the proposed amended petition. In the first count, the Krahmers reallege and incorporate by reference their previous allegations, but add elements of equitable fraud by alleging that "Christie's's representations as to the authenticity of the painting were made for the purpose of inducing the Krahmers to purchase the painting," and the "Krahmers justifiably relied on Christie's's misrepresentations as to the authenticity of the painting when making their purchase of the painting." The second count states that "Christie's's representations as to the authenticity of the painting constitute actual and/or constructive fraud and/or negligent misrepresentation."

12. Ct. Ch. R. 15(a).

13. FS Parallel Fund L.P. v. Ergen, 2004 WL 3048751 at *2, 2004 Del. Ch. Lexis 160 at *6 (Del.Ch. Nov. 3, 2004).

assuming the truth of [the] plaintiff's allegations, [the] plaintiff has failed to state a claim upon which relief may be granted."[14] In effect, the standard to be applied is essentially that which would apply on a motion to dismiss under Court of Chancery Rule 12(b)(6). Therefore, leave to amend should not be granted "where it appears with a reasonable certainty that the plaintiff would not be entitled to the relief sought under any reasonable set of facts properly supported by the complaint, because such amendments would be futile."[15]

Christie's asserts that leave to amend should be denied for two reasons. First, Christie's argues that the newly added claims of mutual mistake of fact, negligent misrepresentation, and equitable fraud are barred by the three-year statute of limitations pursuant to 10 *Del. C.* § 8106. Second, Christie's argues that the Krahmers' amendments fail to state a cognizable claim for negligent misrepresentation under New York law.

### A. *Statute Of Limitations*

The parties do not dispute that the applicable statute of limitations is 10 *Del. C.* § 8106, which imposes a three-year period for claims of negligent misrepresentation and equitable fraud. A cause of action accrues under this section at the time of the wrongful act, "even if the plaintiff is ignorant of the cause of action."[16] For tort claims, a cause of action accrues at the time of the injury.[17] Here, the Krahmers' cause of action accrued in December of 1986 when they purchased the painting from Christie's. This is so because on that date Christie's allegedly injured the Krahmers by misrepresenting the authenticity of the painting. Therefore, unless the Krahmers can demonstrate that the statute of limitations period should be tolled, the Krahmers' claims, which were filed almost 18 years later, are time-barred.[18]

The Delaware courts have narrowly carved out limited circumstances in which the running of the limitations period can be tolled.[19] Such tolling exceptions include the doctrines of (1) fraudulent concealment, (2) inherent unknowable injury, and (3) equitable tolling.[20] "Each of these doctrines permits tolling of the limitations period where the facts underlying a claim were so hidden that a reasonable plaintiff could not timely discover them."[21] If one of these tolling exceptions apply, "the statute will begin to run only upon the discovery of facts constituting the basis of the cause of action or the existence of facts

**14.** *Id., quoting Smith v. Smitty McGee's, Inc.,* 1998 WL 246681, *8, 1998 Del. Ch. Lexis 87, *8 (Del. Ch. May 8, 1998).

**15.** *Id.* *2, 2004 Del. Ch. Lexis 160 at *at *7; see also Rabkin v. Philip A. Hunt Chem. Corp.,* 498 A.2d 1099, 1104 (Del.1985).

**16.** *SmithKline Beecham Pharms. v. Merck & Co.,* 766 A.2d 442, 450 (Del.2000); *Wal–Mart Stores v. AIG Life Ins. Co.,* 860 A.2d 312, 319 (Del.2004).

**17.** *Kaufman v. C.L. McCabe & Sons, Inc.,* 603 A.2d 831, 834 (Del.1992) ("A cause of action in tort accrues at the time of injury.")

**18.** *In re Dean Witter P'ship Litig.,* 1998 WL 442456 at *6, 1998 Del. Ch. Lexis 133 at *23 (Del.Ch. July 17, 1998) ("As the party assert-ing that tolling applies, plaintiffs bear the burden of pleading specific facts to demonstrate that the statute of limitations was, in fact, tolled.")

**19.** *Wal–Mart Stores,* 860 A.2d at 319 (holding that, under Delaware law, "even after a cause of action accrues, the 'running' of the limitations period can be 'tolled' in certain limited circumstances.").

**20.** *Certainteed Corp. v. Celotex Corp.,* 2005 WL 217032, *7, 2005 Del. Ch. Lexis 11, *26 (Del. Ch. Jan. 24, 2005).

**21.** *In re Dean Witter,* 1998 WL 442456 at *5, 1998 Del. Ch. Lexis 133 at *19.

sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery [of the injury]." [22]

In the present motion, the Krahmers argue that the inherently unknowable injury doctrine applies to toll the statute of limitations for their added claims of negligent misrepresentation and actual/constructive fraud.[23] Specifically, the Krahmers contend that the time of discovery rule tolls the statute of limitations for these claims until at least 2002 when they were first told by Sotheby's that the painting may not be authentic.

In *Layton v. Allen*, the Delaware Supreme Court established the inherently unknowable injury exception to the statute of limitations.[24] In *Layton*, a doctor negligently left a surgical instrument in a patient's body. Seven years later, after the instrument was discovered during emergency surgery, the patient brought an action for medical malpractice against the surgeon and the hospital.[25] The defendants argued that the patient's claims were barred by the statute of limitations, which provided for a two-year limitation period accruing at the date of the surgery.

The court in *Layton* held that, under the particular circumstances, the statute of limitations was tolled until the patient discovered the injury. It found that "when an inherently unknowable injury ... has been suffered by one blamelessly ignorant of the act or omission and injury complained of, and the harmful effect thereof develops gradually over a period of time," the injury is tolled until the harmful effects become physically ascertainable.[26] The court found that it would be unreasonable to bar the remedy before the wrong was physically ascertainable by due diligence.[27] According to the court, "the rule of ignorance has no application in a case involving an inherently unknowable injury sustained by a blamelessly ignorant plaintiff." [28]

In addition, *Layton* rejected the lower court's conclusion that the statute was tolled upon an analogy to the doctrine of fraudulent concealment.[29] It determined that the doctrine of fraudulent concealment did not apply to a situation where there were no allegations of actual knowledge or affirmative concealment of the wrong committed. The court explained that it would not equate negligent concealment with fraudulent concealment.[30] Instead, it created a separate exclusion that was to apply only in the narrow circumstances which involve an inherently unknowable injury sustained by a blamelessly ignorant plaintiff.[31]

---

22. *Wal–Mart Stores,* 860 A.2d at 319.

23. The Krahmers alleged in their initial complaint that Christie's fraudulently concealed the authenticity of the painting. This opinion does not address whether the Krahmers' allegations in their initial complaint are sufficient to toll the statute of limitations under the fraudulent concealment doctrine. The court only determines whether the newly added claims of negligent misrepresentation and actual/constructive fraud are timely under the inherent unknowable injury exception.

24. 246 A.2d 794 (Del.1968).

25. *Id.* at 796.

26. *Id.* at 798.

27. *Id.* at 797.

28. *Id.* at 799. The court explained that this was not a case where the plaintiff slept on her rights before she knew, or by reasonable diligence could know, that she had such rights.

29. *Id.* at 798.

30. *Id.*

31. *Id.* The court stated that "we expressly limit this holding to such case; we do not intend any broad relation of the rule of ignorance."

After the *Layton* decision was rendered, the Delaware General Assembly enacted 18 *Del. C.* § 6856, which restricted the court's holding in medical malpractice cases.[32] However, *Layton* remained good law as applied in other contexts. Its rationale has been applied to cases involving accounting malpractice where the taxpayer did not know he suffered an injury until the Internal Revenue Service asserted a claim,[33] and alleged negligence of a plumber where the purchasers of a new septic system had no reason to suspect that the underground system was defective until it malfunctioned.[34]

Perhaps the broadest application of this so called "time of discovery rule" can be found in *Pack & Process, Inc. v. Celotex Corp.*, where a property owner sued in connection with the installation of a defective roof manufactured by the defendant and installed ten years before the defect was discovered.[35] The court, applying the *Layton* rationale, tolled the applicable three-year statute of limitations until the date of the discovery of the defect,[36] holding that, while the injury to the plaintiff was not inherently unknowable, "the na-ture of the contractual relationship between the parties was such that the existence of roof defects and the cause of the leaks was the responsibility of the defendant, and, as such not a condition about which plaintiff should have been knowledgeable."[37]

■ The issue before the court in this case, however, is one of first impression in Delaware—whether the inherently unknowable injury rule applies where an auction house sells an allegedly fake work of art to one who has no specific reason to question its authenticity until long after the three-year statute of limitations has expired.[38] On the one hand, the Krahmers claim to be amateur art collectors who have reasonably relied on the representations of a reputable auction house that held itself out as an expert in American art.[39] In addition, it can be argued that questions as to the authenticity of artwork normally do not arise until some future date, perhaps beyond the statute of limitations when the owner decides to put the artwork up for sale.[40]

---

**32.** *Morton v. Sky Nails,* 884 A.2d 480, 482 (Del.2005).

**33.** *See Isaacson, Stolper & Co. v. Artisan's Sav. Bank,* 330 A.2d 130, 131 (Del.1974); *see also Began v. Dixon,* 547 A.2d 620 (Del.Super.1988) (legal malpractice action where statute of limitations began to run when the client consulted with independent counsel).

**34.** *Rudginski v. Pullella,* 378 A.2d 646, 649 (Del.Super.1977) (The court explained that there was "no reasonable distinction between the cases involving the hidden malpractice of doctors, accountants, and lawyers and the hidden errors of a plumber.").

**35.** 503 A.2d 646 (Del.Super.1985).

**36.** *Id.* at 650.

**37.** *Id.*

**38.** The court notes that the case law in the area of purchasing inauthentic art work at major auction houses is few and far between.

**39.** *See Balog v. Center Art Gallery–Hawaii, Inc.,* 745 F.Supp. 1556, 1565–66, 1573 (D.Haw.1990) (tolling the statute of limitations until the buyers discovered that the painting was not genuine and holding that the amateur buyers were reasonable in relying on the art dealer's representations as the basis for information regarding the authenticity of the art works); *see also* Kai B. Singer, *Sotheby's Sold Me a Fake! Holding Auction Houses Accountable for Authenticating and Attributing Works of Fine Arts,* 23 COLUM.-VLA J.L. & ARTS 439, 440 (2000) ("Where the playing field is uniquely tilted in favor of established merchants of fine art, particularly the major auction houses, the rights of the amateur collections should not be overlooked.").

**40.** *Id.* at 1571.

■ On the other hand, "an auction house acts as an agent on behalf of its consignors."[41] As an agent, its interests are aligned with the consigners and not the purchasers.[42] Here, Christie's is a mere intermediary between the seller who consigns the artwork and the buyer who purchases it at the auction. In effect, Christie's is considered a fiduciary to the consigner and owes a duty only to him.[43]

Furthermore, a prudent buyer of artwork, as in other commercial transactions of similar value, can safeguard his or her investment by verifying its authenticity with an independent third party appraisal.[44] Particularly, a buyer at auction assumes a greater risk as to the authenticity of the work than a buyer who purchases directly from the artist—a risk that is taken into account in the bid price.[45] As explained in *Weisz v. Parke–Bernet Gal-*

*leries, Inc.,* absent fraud on the part of the auction house, "the purchasers assumed the risk that in judging the paintings as readily-identifiable works of the named artist, and scaling their bids accordingly, they may be mistaken."[46] For this reason, the Krahmers cannot reasonably be found to be "blamelessly ignorant" of the authenticity of their painting in the same way that a patient is blamelessly ignorant of an instrument that is left in his body, a purchaser of an underground septic tank is blamelessly ignorant of its defects, or a building owner is blamelessly ignorant that his roofer installed a faulty roof.[47]

Moreover, this is not a circumstance where the discovery of the existence of a cause of action is a "practical impossibility."[48] The Krahmers have not alleged that information on the painting's authenticity was uniquely in the hands of Christ-

**41.** *Cristallina S.A. v. Christie, Manson & Woods Int'l, Inc.,* 117 A.D.2d 284, 292, 502 N.Y.S.2d 165 (N.Y.App.Div.1986); *see also* Singer at 441.

**42.** *Id.* at 292, 502 N.Y.S.2d 165 (holding that an auction house has a fiduciary duty to act in the utmost good faith and in the interest of the consigner, its principal, throughout their relationship).

**43.** Therefore, unlike in *Pack & Process, Inc.* where there was a special contractual relationship between the defendant who certified that the bond would cover all of the damages to the roof and the plaintiff who relied on the installer's assurances, in this circumstance there was no such relationship of trust. 503 A.2d at 650.

**44.** *See* Ralph Lerner & Judith Bresler, *Art Law: The Guide for Collections, Investors, Dealers and Artists* 49 (1989) ("Defects abound in artwork as frequently as in other property. Accordingly, the art buyer should observe the same precautions ordinarily used by the prudent buyer in other commercial transactions of like value."); *Firestone & Parson, Inc. v. Union League of Phila.,* 672 F.Supp. 819, 822 (E.D.Pa.1987) (refusing to apply the discovery rule because the plaintiffs could have learned of the alleged error in attribution prior to the expiration of the limitations period).

**45.** *Weisz v. Parke–Bernet Galleries, Inc.,* 77 Misc.2d 80, 351 N.Y.S.2d 911 (Supp.App. Term1974) ("One of the factors necessarily entering into the competition among bidders at the public auction was the variable value of the paintings depending upon the degree of certainty with which they could be authenticated and established as the works of the ascribed artist."); Singer at 452 (explaining that purchasers are likely to pay less for a painting at an auction than if they buy it from an art dealer because they assume a greater risk of the authenticity of the work).

**46.** 77 Misc.2d at 80–81, 351 N.Y.S.2d 911.

**47.** *Id.* (stating that "they will not now be heard to complain that, in failing to act with caution of one in circumstances abounding with signals of *caveat emptor,* they made a bad bargain").

**48.** The Krahmers do not assert that they were unable to discover the defect prior to the time they tried to sell the painting at Sotheby's. *See In re Dean Witter,* 1998 WL 442456 at *5, 1998 Del. Ch. Lexis at *19–20 ("For the limitations period to be tolled under this doctrine, there must have been no observable or objective factors to put a party on notice of an injury, and plaintiffs must show that they were blamelessly ignorant of the act or omission and the injury.").

ie's. Nor have the Krahmers alleged that they were unable to obtain an appraisal from another art expert. Indeed, the Krahmers could have consulted with an additional source to independently authenticate their painting at any time after the purchase. Through the exercise of reasonable due diligence, the Krahmers could have discovered that the painting might not be a genuine work by Benson well within the limitations period. They failed to do so and now ask Christie's to produce evidence and refresh its memory as to the sale of the painting that took place over 18 years ago.[49]

A leading Second Circuit case under New York law on art, inauthenticity, and the statute of limitations, *Rosen v. Spanierman*, is instructive.[50] In that case, the plaintiffs purchased a painting that the gallery expressly warranted as an original work by John Singer Sargent.[51] Just like in this case, the gallery provided subsequent appraisals of the painting at the plaintiffs' request.[52] When the plaintiffs attempted to sell the painting at a Christie's auction 19 years later, the auction house determined that the painting was not a genuine Sargent. Subsequently, the plaintiffs brought suit against the gallery for common law fraud, negligent misrepresentation, professional negligence, and breach of warranty of authenticity. The gallery argued that the plaintiffs' breach of warranty claims were untimely and sought dismissal of the action under the four-year limitations period pursuant to section 2–725 of New York's Uniform Commercial Code.[53]

The Second Circuit held that the plaintiffs' breach of warranty claims accrued when they purchased the painting and not when they discovered it was inauthentic because the painting's lack of authenticity was immediately discoverable through the trained eye of an art expert.[54] The court determined that it was not unreasonable to expect a purchaser of valuable art to obtain a second opinion on the painting's authenticity. It reasoned that "requiring a purchaser to obtain that appraisal from an expert other than the seller is not an onerous burden." [55]

As a result, the Second Circuit held that the discovery exception to the statute of limitations contained in section 2–725(2) was not applicable, and that the plaintiffs' breach of warranty claims were untimely.[56]

---

**49.** The court notes that the individual at the Detroit Club who handled the sale of the painting and had important information relevant to the authenticity and consignment of the painting is deceased. Therefore, the court would have to rely on other witness' memories of the sale that took place almost 20 years ago. *See Rudginski*, 378 A.2d at 649 (explaining that the purpose of the underlying statute of limitations is one of fairness to the defendant in that the defendant should not be expected to be called upon to defend against stale claims).

**50.** 894 F.2d 28 (2d Cir.1990); *see also Foxley v. Sotheby's Inc.*, 893 F.Supp. 1224, 1232 n. 8 (S.D.N.Y.1995) (holding that the statute of limitations barred a negligent misrepresentation claim brought against Sotheby's by a purchaser of a fake painting).

**51.** *Id.* at 30.

**52.** *Id.* The gallery provided five subsequent appraisals over the years.

**53.** *Id.* at 30–31.

**54.** *Id.* at 32, 36 n. 2 (holding that the defect was discoverable immediately after the good was purchased); *see also Firestone & Parson*, 672 F.Supp. at 822 (holding that in the absence of fraudulent concealment by the defendant, the statute of limitations began to run when the buyer purchased the inauthentic painting).

**55.** *Id.*

**56.** *Id.* at 33.

This holding in *Rosen*, although decided in the context of a breach of warranty claim under the UCC's statute of limitations, supports the determination that the authenticity of a painting is readily discoverable and not an "inherently unknowable injury" for purposes of the discovery rule.[57]

In the instant case, Christie's warranted the authenticity of the work for six years.[58] The warranty by its express terms created a reasonable inference that Christie's put the Krahmers on inquiry notice that claims involving the authenticity of the painting could only be brought within six years from the date of purchase. Accordingly, the court cannot reasonably allow the Krahmers to bring a claim for rescission based on a theory of negligence years after the expiration of both the applicable statute of limitations and the Christie's express warranty.[59]

For the foregoing reasons, the court concludes that the Krahmers do not satisfy the discovery rule to toll the time for bringing these amended claims. As a result, since their amended causes of action for negligent misrepresentation and actual/constructive fraud expired in 1989, three years after they purchased the painting, granting leave to amend the petition filed in 2004, would be futile.

## B. *Negligent Misrepresentation*

■■■ Christie's argues that there is no cognizable claim of negligent misrepresentation under New York law for a commercial relationship of this type.[60] Under New York law, to state a claim for negligent misrepresentation, the plaintiff must allege that:

**57.** *Id.* at 33. The court also found that the gallery's subsequent appraisals did not extend the plaintiffs' warranty to future performance. The court reasoned that the appraisals themselves contained no warranties and were completely separate transactions from the sale of the painting. *See also Wilson,* 850 F.2d at 7 (barring a claim under the statute of limitations where the plaintiff art buyer discovered the painting was a fake 26 years after the purchase and finding that the plaintiff easily could have discovered the problem from the outset by obtaining a second expert option); *but see Balog,* 745 F.Supp. at 1571 (holding that when purchasing a painting from an art dealer, "to force buyers to secure an additional warranty of future performance after an expert had certified a piece as genuine would be not only redundant, but ridiculous.").

**58.** The Krahmers do not allege that they were unaware of the warranty when they purchased the painting or that they lacked the sophistication or understanding of the general rules governing the auction. The six-year warranty provided protection to the Krahmers beyond the applicable three-year Delaware statute of limitations and the four-year UCC statute of limitations. U.C.C. § 2–725(1) (1999).

**59.** In *Wilson v. Hammer Holdings,* 850 F.2d 3, 8–9 (1st Cir.1988), the court did not reach the issue of whether the plaintiff's negligent misrepresentation action should be tolled under the discovery rule because it would not characterize a claim of this type as a cause of action based in tort. Instead, the court found that the claim fell squarely within the laws of contract and was therefore barred by the statute of limitations of the U.C.C.

**60.** The parties agree that, although Delaware law applies with respect to the statute of limitations, New York substantive law applies to the Krahmers' claims. The Krahmers consented to the application of New York law by purchasing the painting under the terms of the auction catalogue, which provided that the law of New York, the site of the auction, governed. In addition, Christie's made the claims regarding the authenticity of the painting in New York where the painting was purchased. Therefore, under Delaware's "most significant relationship test," as set forth in the Restatement (Second) of Conflicts, New York law governs the Krahmers' claims. *See Gloucester Holding Corp. v. U.S. Tape & Sticky Prods.,* 832 A.2d 116, 124 (Del. Ch.2003).

(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment.[61]

"Generally there is no liability for words negligently spoken but … there is an exception when the parties' relationship suggests a closer degree of trust and reliance than that of the ordinary buyer and seller."[62] A plaintiff may only recover for negligent misrepresentation where there is a fiduciary or special relationship between the parties.[63]

Here, Christie's contends that there was no such fiduciary or special relationship between the Krahmers and Christie's. The Krahmers argue to the contrary that the court could find that they had a special relationship with Christie's due to their long history of dealings with the auction house. Specifically, the Krahmers highlight the following elements of that relationship: (1) the parties were in privity of contract for the purchase of the painting; (2) Christie's provided the name plate and an appraisal at the time of the sale allegedly authenticating the work; (3) an agent on behalf of Christie's traveled to the Krahmers' home in 1990 to reassess and appraise the painting; and (4) Christie's directed the Krahmers to the Catalogue Raisonné Committee in 2002 and arranged the transport of the painting to the Committee. The court concludes that these rather sparse alleged contacts with Christie's, mostly dealing with the transaction at issue, cannot reasonably lead to the finding that the parties had a special relationship.

New York cases have held that the purchase of a painting and subsequent appraisals from an auction house do not create the special relationship necessary to maintain a negligent misrepresentation claim.[64] In *Rosen v. Spanierman*, the low-

---

**61.** *Hydro Investors v. Trafalgar Power*, 227 F.3d 8, 20–21 (2d Cir.2000); *Fresh Direct v. Blue Martini Software*, 7 A.D.3d 487, 489, 776 N.Y.S.2d 301 (N.Y.App.Div.2004).

**62.** *American Protein Corp. v. AB Volvo*, 844 F.2d 56, 63 (2d Cir.1988), *cert. denied*, 488 U.S. 852, 109 S.Ct. 136, 102 L.Ed.2d 109 (1988) (*citing Coolite Corp. v. American Cyanamid Co.*, 52 A.D.2d 486, 488, 384 N.Y.S.2d 808 (1st Dept.1976)).

**63.** *Dallas Aero., Inc. v. CIS Air Corp.*, 352 F.3d 775, 788 (2d Cir.2003) (holding that liability for negligent misrepresentation is imposed on those who are in a special position of confidence and trust with the injured party than that of an ordinary buyer and seller); *Fresh Direct*, 7 A.D.3d at 489, 776 N.Y.S.2d 301 (holding that in the commercial context, liability for negligent misrepresentation has been imposed only on those persons who are in a special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified); *Hudson River Club v. Consol. Edison Co.*, 275 A.D.2d 218, 220, 712 N.Y.S.2d 104 (2000) ("A claim for negligent misrepresentation can only stand where there is a special relationship of trust or confidence, which creates a duty for one party to impart correct information to another, the information given was false, and there was reasonable reliance upon the information given."); *Stewart v. Jackson & Nash*, 976 F.2d 86, 90 (2d Cir.1992) ("a plaintiff may recover for negligent misrepresentation only where the defendant owes her a fiduciary duty").

**64.** *Foxley*, 893 F.Supp. at 1232 (dismissing a claim of negligent misrepresentation for failing to allege a special relationship between the purchaser of a painting and the auction house); *Rosen*, 711 F.Supp. at 758 (holding that the mere purchase of a painting from defendant and subsequent appraisals do not create the special relationship necessary to maintain a negligence claim); *see also Ravenna v. Christie's, Inc.*, 289 A.D.2d 15, 734 N.Y.S.2d 21, 22 (N.Y.App.Div.2001) (holding that no special relationship existed between

er court held that the relationship between a buyer and seller of a painting is merely contractual in nature and is insufficient to sustain a cause of action for negligent misrepresentation.[65] In addition, the court concluded that the subsequent appraisals given by the seller to the buyer did not form a special relationship necessary to maintain a negligent misrepresentation claim. The court determined that these appraisals were completely separate transactions between the parties "which had no bearing on the relationship between the parties at the relevant time, that is, when the alleged negligent misrepresentations were made."[66] Therefore, it granted the defendant's motion for summary judgment on the plaintiff's negligent misrepresentation claim.

Also, the court in *Foxley v. Sotheby's Inc.* dismissed a negligent misrepresentation claim by a buyer against an auction house because there was no special or fiduciary relationship between the parties.[67] The action was dismissed in *Foxley* even though the plaintiff "meticulously laid out an array of allegations establishing a significant association" between himself and the auction house throughout two decades.[68] These interactions between the parties included personal visits, viewings of the plaintiff's personal collection, introductions to Sotheby's key personnel, and private luncheons. Nevertheless, the court concluded that the plaintiff failed to allege a fiduciary relationship between the parties sufficient to satisfy a claim for negligent misrepresentation.[69]

Based on this unequivocal precedent, the court cannot possibly infer from the Krahmers' allegations that a special relationship existed between the Krahmers and Christie's.[70] Therefore, the court concludes that the Krahmers' proposed amendments fail to state a claim for negligent misrepresentation.

## III.

For these reasons, the motion for leave to amend the petition is DENIED. IT IS SO ORDERED.

---

the auction house and the party seeking an appraisal of a painting).

65. *Rosen,* 711 F.Supp. at 758–59.

66. *Id.* at 759.

67. 893 F.Supp. at 1232.

68. *Id.*

69. *Id.*

70. The court is not convinced by the Krahmers' argument that *Parrott v. Coopers,* 95 N.Y.2d 479, 718 N.Y.S.2d 709, 741 N.E.2d 506 (N.Y.2000), a case dealing with a negligent misrepresentation claim against a professional accounting firm over a valuation of stock, is controlling in this situation. In *Parrott,* the court held that there must be a showing of at least privity between the parties before a plaintiff may recover in tort for pecuniary loss sustained as a result of an accountant's negligent misrepresentation. It explained that "such a requirement is necessary in order to provide fair and manageable bounds to what otherwise could prove to be limitless liability." The court was merely reiterating a general long-standing rule applied in accounting and other professional malpractice suits, and did not intend, as the Krahmers' contend, to eliminate or call into question the requirement that a special relationship of trust and confidence is needed to maintain a negligent misrepresentation claim in other contexts.