**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| MW GESTION, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | C.A. No. 2023-0907-JTL |
| SINOVAC BIOTECH LTD., WEIDONG YIN, NAN WANG, SIMON ANDERSON, YUK LAM LO, KENNETH LEE, MENG MEI, SHAN FU, and WILMINGTON TRUST, NATIONAL ASSOCIATION, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## ORDER GRANTING MOTION TO DISMISS

1.     Defendant Sinovac Biotech Ltd. ("Sinovac") is a biopharmaceutical company incorporated in Antigua and headquartered in Beijing, China. Sinovac focuses on the research, development, manufacturing, and commercialization of various vaccines. Defendants Weidong Yin has been Sinovac's President, CEO, and Chairman since 2003. Yin, Nan Wang, Simon Anderson, Yuk Lam Lo, Kenneth Lee, Meng Mei, and Shan Fu have served as members of Sinovac's board of directors (the "Board"). Plaintiff MW Gestion (the "Investor") is an asset management firm based in France.

2.     Starting in January 2016, Sinovac received a series of take-private proposals from two competing consortiums. A group led by Yin (the "Yin Group") offered to acquire Sinovac for $6.18 per share, and Sinovac made that offer public on January 5, 2018. A different consortium of investors (the "Consortium") announced a competing bid at $7 per share on February 3, 2016. About two months later, Sinovac

adopted a rights plan with a 15% beneficial ownership trigger (the "Rights Plan"). To implement the Rights Plan, the Board entered into a rights agreement with Pacific Stock Transfer Company. That agreement provides that Delaware law governs its terms.

3. When the Rights Plan was adopted, the Board distributed the rights by declaring a dividend of one right per share. Until a date defined as the "Distribution Date," the rights trade in conjunction with the shares. On the Distribution Date, the rights separate from the shares. At that point, the shares trade without the rights, and the rights can be transferred separately.

4. The "Distribution Date" is the earlier of

(i) the close of business on the tenth (10th) Business Day after the Share Acquisition Date or (ii) the close of business on the tenth (10th) Business Day after the date of the commencement of, or first public announcement of the intent of any Person (other than an Exempt Person) to commence, a tender or exchange offer the consummation of which would result in any Person becoming an Acquiring Person.

Dkt. 30 Ex. 1.

5. After the Distribution Date, each right allows a holder other than the Acquiring Person to purchase Sinovac shares at a discount. Alternatively, the Board can authorize holders other than the Acquiring Person party to exchange each right for Sinovac equity (an "Exchange"). *Id.* at ¶ 45.

6. On June 26, 2017, Sinovac announced that it entered into a definitive agreement with the Yin Group to acquire the company for $7.00 per share (the "Yin Merger"). The Board approved the Yin Merger without giving the Consortium the opportunity to respond. Two days later, the Consortium increased its offer to

$8.00 per share. The Board did not accept this offer. The Board did not even disclose it until November 22, 2017, five months later.

7. On February 6, 2018, Sinovac held its annual general meeting to elect directors. The Consortium voted for an alternative slate. So did 1Globe Capital LLC and the Chiang Li Family, which had acquired approximately 31% of Sinovac's stock. Although the Consortium prevailed, the Board determined that under Antiguan law, the Consortium failed to provide proper notice of their intention to nominate an alternative slate. A month later, Sinovac announced that the incumbent directors were re-elected by a majority of the votes validly cast.

8. The Yin Merger required the affirmative vote of at least two-thirds of the outstanding stock. Yin and his allies owned only 29.5%. With the Consortium, 1Globe, and the Chiang Li family seemingly opposed, the Yin Group could not carry the day. So the Board changed course.

9. On July 2, 2018, the Board sold nearly 12 million shares to Vivo Capital and Advantech Capital (the "PIPE Transaction"). Both firms were part of the Yin Group. The issuance represented approximately 20% of the outstanding shares. On July 3, Sinovac announced both the PIPE Transaction and the termination of the Yin Merger.

10. On February 22, 2019, the Board determined that 1Globe triggered the Rights Plan at some point before the 2018 annual general meeting. The Board opted to effectuate an Exchange in which non-triggering holder would receive for each right 0.655 shares of common stock and 0.345 shares of newly created Series B Convertible

Preferred Stock. The Board opted to base the Exchange on the shares outstanding on February 22, 2019. Because that date was after the PIPE Transaction, the purchasers in the PIPE Transaction would benefit from the Exchange.

11.     Sinovac placed the shares in a trust for the benefit of the Company's stockholders who are entitled to receive the equity. The trust is governed by a trust agreement between Sinovac and Wilmington Trust National Association, which serves as trustee.

12.     Sinovac's proxy statement filed on January 5, 2018, contains information suggesting that the Board knew as early as 2016 that 1Globe had triggered the Rights Plan, either because the Chiang Li Family controlled 1Globe or because they had a voting agreement. Other information in the proxy statement suggested that the Board knew that 1Globe and other investors triggered the Rights Plan as early as July or October of 2017. The SEC brought an enforcement action on May 13, 2020, against 1Globe and its owners. In that action, the SEC determined that 1Globe was owned by Jiaqiang "Chiang" Li, who also controlled shares represented by the Chiang Li Family. And in a court filings Sinovac has admitted that 1Globe triggered the Rights Plan before the 2018 annual general meeting.

13.     The triggering date is significant because once the rights separated from the shares on the Distribution Date, they remained with the holders of the shares as of that date (unless otherwise transferred). The stockholders population who could participate in the Exchange therefore depends on the correct Distribution Date.

14.     On September 6, 2023, the Investor brought this action against Sinovac, Yin, Wang, Anderson, Lo, Lee, Mei, Fu, and Wilmington Trust. The Investor asserted claims for breach of contract and fiduciary duty, aiding and abetting breach of contract and fiduciary duty, and wrongful dilution. The Investor sought declaratory and injunctive relief. The Investor claims that Sinovac breached the Rights Plan and the directors breached their fiduciary duties by conducting the Exchange based on the shareholder population as it existed in 2019, despite knowing that the Distribution Date had occurred as early as 2016. The Investor argues that the Board should have conducted the Exchange based on the earlier Distribution Date. As a practical matter, the Investor will be able to participate in the Exchange if there was an earlier Distribution Date, but not with the Board's chosen date for the Exchange.

15.     The defendants have moved to dismiss the Investor's claims under Rule 12(b)(6).

16.     "When considering a defendant's motion to dismiss, a trial court should accept all well-pleaded factual allegations in the Complaint as true, accept even vague allegations in the Complaint as 'well-pleaded' if they provide the defendant notice of the claim, draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof." *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).

17.     The defendants argue that the Investor's claims are time barred. For a court to grant a Rule 12(b)(6) motion on timeliness grounds, the complaint's

allegations must show that the claim was filed too late. *Lebanon Cnty. Emps.' Ret. Fund v. Collis*, 287 A.3d 1160, 1193 (Del. Ch. 2022) (citing *Kahn v. Seaboard Corp.*, 625 A.2d 269, 277 (Del. Ch. 1993) (Allen, C.)). When evaluating whether the factual allegations in a complaint support a timeliness defense, a court "must draw the same plaintiff-friendly inferences required in a 12(b)(6) analysis." *State ex rel. Brady v. Pettinaro Enters.*, 870 A.2d 513, 524–25 (Del. Ch. 2005). When reviewing a timeliness defense, "court effectively assumes the validity of the claims, then applies timeliness principles." *Collis*, 287 A.3d at 1193.

18. "Both the doctrine of laches and statutes of limitations function as time bars to lawsuits." *Whittington v. Dragon Gp., L.L.C.*, 991 A.2d 1, 7 (Del. 2009). "If a plaintiff brings a legal claim seeking legal relief in the Court of Chancery, the statute of limitations (and its tolling doctrines) logically should apply strictly and laches should not apply." *Kraft v. WisdomTree Invs., Inc.*, 145 A.3d 969, 983 (Del. Ch. 2016). If a plaintiff brings an equitable claim seeking equitable relief, "the doctrine of laches applies and any applicable statute of limitations would apply only by analogy," and "the Court tends to afford great weight to the analogous statutory period . . . and may bar a claim without further laches analysis." *Id.* "When an equitable claim seeks legal relief or a legal claim seeks equitable relief, the Court also will apply the statute of limitations by analogy, but with at least as much and perhaps more presumptive force." *Id.*

19. "Laches consists of two elements: (i) unreasonable delay in bringing a claim by a plaintiff with knowledge thereof, and (ii) resulting prejudice to the

defendant." *Levey v. Brownstone Asset Mgmt., L.P.*, 76 A.3d 764, 769 (Del. 2013). "A filing after the expiration of the analogous limitations period is presumptively an unreasonable delay for purposes of laches." *Id.*

20.     The Investor advances both legal and equitable claims and seeks both legal and equitable relief. Laches therefore applies, but the laches analysis starts by determining the analogous statute of limitations.

21.     The statute of limitations analysis is complicated because the Investor sued in Delaware, but the claims implicate the internal affairs of an Antiguan corporation. Delaware's borrowing statute directs the court to apply whichever limitations period is shorter. 10 *Del. C.* § 8121. A judicial gloss on that statute requires applying the shorter statute unless the foreign statute of limitations is *both* longer *and* "the party asserting the underlying claim was forced file in Delaware." *CHC Invs., LLC v. FirstSun Cap. Bancorp*, 2020 WL 1480857, at \*8 (Del. Ch. March 23, 2020), *aff'd*, 241 A.3d 221 (Del. 2020); *accord* 10 Del. C. § 8121; *Saudi Basic Indus. Corp. v. Mobil Yanbu Petrochemical Co.*, 866 A.2d 1, \*16–18 (Del. 2005).

22.     The Investor represents that under Antiguan law, a six-year statute of limitations governs breach of contract claims and tort claims generally. The Investor asserts that there is no limitations period for breach of fiduciary duty or wrongful dilution claims, which are governed by the doctrine of laches. Dkt. 41; *accord* Dkt. 41 Exs. 6–7. Delaware has a three-year limitations period for claims for "damages caused by an injury unaccompanied with force," which applies to contract and tort cases. 10 Del. C. § 8106(a), (c). For claims for breach of fiduciary duty, this court also

applies the doctrine of laches, but "this court regularly looks to section 8106 of Title 10 and its three-year limitations period" to establish a presumptively reasonable period for suit. *Collis*, 287 A.3d at 1195.

23. Delaware's three-year limitations period is shorter than Antigua's limitations period for all of the Investor's claims. The Investor was not forced to file in Delaware. Delaware's three-year limitations period therefore applies.

24. "In addressing when an action is time-barred, a necessary first step in the analysis is determining the time when the action accrued." *US Cellular Inv. Co. of Allentown v. Bell Atlantic Mobile Sys., Inc.*, 677 A.2d 497, 503 (Del. 1996). "The statute of limitations begins to run at the time that the cause of action accrues." *Collis*, 287 A.3d at 1195 (internal quotation marks omitted). "Delaware is an occurrence rule jurisdiction." *ISN Software Corp. v. Richards, Layton & Finger, P.A.*, 226 A.3d 727, 732 (Del. 2020) (internal quotation marks omitted). "In Delaware, for contract claims, the wrongful act occurs at the time a contract is breached." *Id.* (cleaned up). "For tort claims . . . the wrongful act occurs at the time of injury." *Id.* (cleaned up). Like other types of claims, "[a] claim for breach of fiduciary duty accrues at the time of the wrongful act." *Sutherland v. Sutherland*, 2010 WL 1838968, at *8 (Del. Ch. May 3, 2010). The concept of injury for purposes of accrual does not require that a plaintiff have suffered quantifiable damages, even if pleading damages is an element of the cause of action. *See ISN Software*, 226 A.3d at 733 ("Under the

Delaware occurrence rule, injury is distinct from damages. The statute of limitations can start to run before any 'actual or substantial damages' occur." (citation omitted)).

25. In this case, the Investor filed the complaint on September 6, 2023. The Investor's claims are only timely if they accrued after September 6, 2020. They did not. The Investor's claims stem from the Board conducting the Exchange in 2019, making the lawsuit untimely.

26. The Investor argues that the Exchange has never been implemented because Sinovac sued 1Globe in this court and the court entered a *status quo* order staying the Exchange, which remains in effect today. That does not change the date the claim accrued. The stay of the Exchange makes a remedy more feasible by preventing substantial damages, but it does not affect when the wrong happened.

27. The Investor also argues for relief from the statute of limitations because the delay was attributable to the Antigua action between Sinovac and 1Globe, which remains pending. The Investor, however, alleges that 1Globe's actions triggered the Rights Plan and the Board knew it as early as 2016 or, in the alternative, on many other occasions in the next two years. The Investor did not need the information from another litigation mentioned in the complaint to file this action.

28. The Investor also cites *Gohl* and argues that "the statute of limitations is tolled for claims of wrongful self-dealing, even in the absence of actual fraudulent concealment." Dkt. 41 at 25 (citing *Caspian Select Credit Master Fund Ltd. v. Gohl*, 2015 WL 5718592, at *14 (Del. Ch. Sept. 28, 2015)). Equitable tolling prevents the limitation period from running until "the discovery of facts constituting the basis of

the cause of action or the existence of facts sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery of the injury." *Krahmer v. Christie's Inc.*, 903 A.2d 773, 778–79 (Del. Ch. 2006). In other words, the time for filing suit begins to run at the point of inquiry notice.

29. The Investor's claims flow from the competing offers by the Yin Group and the Consortium in 2016, the events leading up to Sinovac's annual general meeting in 2018, the PIPE Transaction in 2018, and the Exchange in 2019. The complaint relies on Sinovac's and 1Globe's contemporaneous public announcements and SEC filings, up to and including an SEC enforcement order against 1Globe issued on May 13, 2020.

30. This information put the Investor on inquiry notice by May 13, 2020. The Investor did not file suit until September 2023. That degree of delay is unreasonable.

31. Laches bars the claims. The motion to dismiss is GRANTED. In light of the rulings made in this order, the court has not reached the defendants' other arguments for dismissal.

/s/ J. Travis Laster
Vice Chancellor Laster
September 23, 2024