**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| IRV EDWARDS, M.D., MARK BELL, M.D., BRUCE HENSEL, M.D., and STEVE MARON, M.D., | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | C.A. No. 2024-0591-LWW |
| GIGACQUISITIONS2, LLC, GIGCAPITAL2, INC., UPHEALTH, INC., AVI KATZ, RALUCA DINU, CHIRINJEEV KATHURIA, THE NEEDHAM GROUP, INC., NEEDHAM & COMPANY, LLC, and CONTINENTAL STOCK TRANSFER & TRUST, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM OPINION**

Date Submitted: April 4, 2025
Date Decided: July 25, 2025

Elizabeth A. Sloan, BALLARD SPAHR LLP, Wilmington, Delaware; David B. Harrison, SPIRO HARRISON & NELSON, Montclair, New Jersey; Shomik Ghosh, SPIRO HARRISON & NELSON, New York, New York; *Counsel for the Plaintiffs*

Ronald N. Brown, III & Kelly L. Freund, DLA PIPER LLP (US), Wilmington, Delaware; Melanie E. Walker & Emma C. Peplow, DLA PIPER LLP (US), Los Angeles, California; *Counsel for Defendants GigAcquisitions2, LLC, GigCapital2, Inc., UpHealth, Inc., Avi Katz, and Raluca Dinu*

Michael A. Barlow & Hayden J. Driscoll, QUINN EMANUEL URQUHART & SULLIVAN, LLP, Wilmington, Delaware; Michael B. Carlinsky, James C. Tecce, Maxwell R. Hawley & H. Lin Zhu, QUINN EMANUEL URQUHART & SULLIVAN, LLP, New York, New York; *Counsel for Defendant Dr. Chirinjeev Kathuria*

Stephen B. Brauerman & Sarah T. Andrade, BAYARD, P.A., Wilmington, Delaware; Edward Flanders & Jay D. Dealy, PILLSBURY WINTHROP SHAW PITTMAN LLP, New York, New York; *Counsel for Defendants Needham & Company, LLC and The Needham Group, Inc.*

Peter B. Ladig & Abraham C. Schneider, BAYARD, P.A., Wilmington, Delaware; Mark A. Harmon & James Van Splinter, CHIESA SHAHINIAN & GIANTOMASI PC, New York, New York; *Counsel for Defendant Continental Stock Transfer & Trust Company*

**WILL, Vice Chancellor**

In November 2020, GigCapital2, Inc.—a SPAC—combined with Cloudbreak Health, LLC and UpHealth Holdings, Inc. Cloudbreak was high performing; UpHealth was struggling. The combined company went bankrupt.

The plaintiffs are former Cloudbreak members and option holders. They bring an assortment claims against defendants including GigCapital2 and its principals, UpHealth Holdings' cofounder and financial advisor, and the merger transfer agent. Their overarching complaint is that they were misled about UpHealth Holdings' prospects. They also contend that the delivery of their merger consideration was delayed, leaving them unable to sell at a favorable time.

The plaintiffs' claims suffer from numerous defects. This court lacks jurisdiction over the transfer agent. The plaintiffs lack standing to sue for breach of UpHealth Holdings' merger agreement. Several claims are time-barred. And the remainder are not reasonably conceivable. The case is dismissed in full.

## I.      FACTUAL BACKGROUND

The following facts are drawn from the operative Complaint, the documents it incorporates by reference, and matters subject to judicial notice.[1]

---

[1] First Am. Verified Compl. (Dkt. 39) ("Am. Compl."); *see Freedman v. Adams*, 2012 WL 1345638, at *5 (Del. Ch. Mar. 30, 2012) ("When a [petitioner] expressly refers to and heavily relies upon documents in her complaint, these documents are considered to be incorporated by reference into the complaint[.]" (citation omitted)); *see also In re Books-A-Million, Inc. S'holders Litig.*, 2016 WL 5874974, at *1 (Del. Ch. 2016) (explaining that the court may take judicial notice of "facts that are not subject to

## A.    Cloudbreak

Cloudbreak Health, LLC was founded in 2015 to improve health outcomes for non-English speaking patients through HIPAA-compliant remote interpretation and translation services.[2]  Plaintiffs Dr. Irv Edwards, Dr. Mark Bell, Dr. Steve Maron, and Dr. Bruce Hensel were among its early investors.[3]  Edwards and Bell received Cloudbreak common units, giving them each a 15.7% ownership interest.[4] Edwards also became a member of Cloudbreak's Board of Directors.[5]  Maron received units amounting to a 3.16% ownership interest.[6]  Hensel—Cloudbreak's Chief Medical Officer—was granted Cloudbreak options that vested in 2016.[7]

Cloudbreak's revenue, valuation, and market share grew rapidly.[8] Its success attracted outside investors.  In 2015, alternative asset management firm Kayne

---

reasonable dispute" (citing *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 170 (Del. 2006))).

[2] Am. Compl. ¶ 34.

[3] *Id.* ¶¶ 28-36.

[4] *Id.* ¶ 34.

[5] *Id.*

[6] *Id.*

[7] *Id.*

[8] *Id.* ¶¶ 35-36.

Anderson Capital Advisors, L.P. made a large investment in exchange for a financial interest.[9]

## B. Gig2 and UpHealth

In March 2019, defendants Dr. Avi Katz and Raluca Dinu incorporated GigCapital2, Inc. ("Gig2") in Delaware as a special purpose acquisition company (SPAC).[10] Defendant GigAcquisitions2, LLC—a Delaware limited liability company—served as Gig2's sponsor (the "Sponsor").[11] Katz was the Sponsor's managing member and the Chief Executive Officer, President, Secretary, Executive Chairman, and a director of Gig2.[12] Dinu was a founding managing partner and a director of Gig2.[13] In June 2019, Gig2 completed its initial public offering.[14]

A few months later, in November 2019, defendant Dr. Chirinjeev Kathuria cofounded UpHealth Services, which later became UpHealth Holdings, Inc.—a healthcare services company offering a digital platform for healthcare providers,

---

[9] Am. Compl. Ex. A ("Locke Aff.") ¶ 2; *see also* Am. Compl. ¶¶ 111, 116 (referring to Kayne and its subsidiary entity, Martti in the USA, as "Cloudbreak's private equity investor" and "the largest shareholder in Cloudbreak at the time").

[10] Am. Compl. ¶¶ 18, 20-21.

[11] *Id.* ¶ 19.

[12] *Id.* ¶ 20.

[13] *Id.* ¶ 21.

[14] *Id.* ¶ 18.

3

health systems, and payors.[15]   Kathuria's broader portfolio included five other healthcare companies: Thrasys, Inc., Behavioral Health Services, LLC ("BHS"), TTC Healthcare, Inc., Glocal Healthcare Systems Private Limited, and Innovations Group (collectively, the "Portfolio Companies").[16]   The Portfolio Companies were struggling and debt-ridden.[17]

In March 2020, Kathuria hired defendant investment bank Needham & Company, LLC to seek out merger partners or secure financing for the Portfolio Companies.[18]   Needham's compensation was largely contingent on completing a transaction.[19]   Needham and Kathuria allegedly "gerrymander[ed]" the Portfolio Companies' projections and financials to enhance their appeal to potential buyers.[20]

---

[15] *Id.* ¶ 22; Locke Aff. Ex. A ("UpHealth Oct. Presentation") 7, 9.  Though the presentation is labeled "September 2020," the plaintiffs allege that they were shown the presentation "on or about October 5, 2020."  Am. Compl. ¶ 85.

[16] Am. Compl. ¶¶ 2, 38.  Kathuria rejects the notion that these entities were "his companies."  *See* Def. Kathuria's Opening Br. in Supp. of Mot. to Dismiss First Am. Compl. (Dkt. 55) ("Kathuria Opening Br.") 13-14.

[17] Am. Compl. ¶¶ 2, 7.

[18] *Id.* ¶ 38.  I refer to defendants Needham & Company, LLC and The Needham Group, Inc. collectively as "Needham."

[19] *Id.* ¶ 39 ("In exchange for these services, Needham was to not only receive an upfront payment but also various success-based fees, including potentially 5% of the gross proceeds from the sale of any securities in a private placement offering and 4% of gross proceeds from sales made via third-party introductions, as well as warrants to buy an amount equal to 2% of the securities sold in any offering.").

[20] *Id.* ¶ 41; *see also id.* ¶¶ 42-50 (discussing alleged manipulations of the Portfolio Companies' financials).

In internal communications, Needham junior employees expressed that the "only shot" to sell the Portfolio Companies was to "g[e]t lucky with a SPAC."[21]

In summer 2020, Needham and Kathuria approached Gig2, which was seeking out a de-SPAC target. By September, Katz was engaging with Needham and Kathuria about bringing the Portfolio Companies public.[22]

### C. The Merger Proposal and Due Diligence

Katz and Kathuria approached Cloudbreak to "convince [it] to join the Portfolio Companies in a SPAC transaction."[23] Because Cloudbreak was initially unwilling to work with Kathuria, Katz took the lead in negotiations to assure Cloudbreak of the deal's merit.[24] Katz told Cloudbreak that he had independently

---

[21] *Id.* ¶¶ 50-51.

[22] *Id.* ¶ 72.

[23] *Id.* ¶ 75. Katz, Dinu, Gig2, the Sponsor, and UpHealth, Inc. (together, the "Gig2 Defendants") dispute this version of events. *See* the Gig2 Defs.' Opening Br. in Supp. of Mot. to Dismiss Verified First Am. Compl. (Dkt. 59) ("Gig2 Defs.' Opening Br.") 10 n.6. Citing Gig2's May 2021 prospectus, the Gig2 Defendants contend that UpHealth Holdings had entered into a term sheet to acquire Cloudbreak before they met with Cloudbreak. *Id.* They argue that it was only after Kathuria introduced Cloudbreak's CEO to Katz that the parties discussed Gig2 acquiring Cloudbreak directly. *Id.* They ask that I credit their version of events because it is recounted in a public filing with the Securities and Exchange Commission. *Id.* (citing *Omnicare, Inc. v. NCS Healthcare, Inc.*, 809 A.2d 1163, 1167 (Del. Ch. 2002)). Although I take judicial notice of the prospectus, I cannot assume the truth of its contents. *See Pulieri v. Boardwalk Props., LLC*, 2015 WL 691449, at *4 n.24 (Del. Ch. Feb. 18, 2015) ("Taking judicial notice of the truth of the statements . . . is beyond the scope of what [the Delaware Rules of Evidence] permits."). I must accept the plaintiffs' version of events as true. *See infra* note 129 and accompanying text.

[24] Am. Compl. ¶ 75.

"diligence[d] the deal and Cloudbreak could trust that the financial numbers were sound."[25]

Katz allegedly gave Cloudbreak "false investor presentations" prepared by Needham.[26] The presentations "falsely showed [that] each of the Portfolio Companies were in strong financial condition and were positioned for future success."[27]

On October 5, 2020, Cloudbreak "received a series of diligence materials from Katz, Kathuria, and Needham," including a management presentation dated September 2020 (the "October Presentation") that gave "specific details about each of the Portfolio Companies."[28] The October Presentation "represented that UpHealth Services was made up of four companies—Glocal, Thrasys, Transformations, and MedQuest."[29] The presentation reflected 2019 revenues for

---

[25] *Id.* ¶¶ 79, 111; Locke Aff. ¶ 8 ("Dr. Kathuria and Katz told the Board that the data and information they presented about UpHealth Holdings was accurate and that they had conducted diligence into those companies. Mr. Katz made clear that [Gig2] had independently diligenced the information.").

[26] Am. Compl. ¶¶ 80, 83.

[27] *Id.* ¶ 84.

[28] *Id.* ¶ 85; Locke Aff. ¶ 7.

[29] UpHealth Oct. Presentation 24; *see also* Am. Compl. ¶ 86.

these companies.[30]  The figures given for Thrasys and Transformations were allegedly "inflated" because they included "hidden" revenues of other companies.[31]

Kathuria and Needham gave Cloudbreak another presentation "filled with falsehoods" in June 2020 (the "June Presentation").[32]  For example, it showed that Glocal had signed a $138 million contract but "an alternative presentation, not shared with Cloudbreak, revealed [that] the purported contract . . . was worth—at most—$60 million."[33]  The October Presentation also represented that Glocal served 2,000 patients per day—twice that shown in the alternative presentation.[34]  Both the June and October Presentations "claimed Thrasys had enjoyed 86% growth in 2019," but "alternative presentations prepared by the defendants showed 69% growth for the same period."[35]  The June and October Presentations further "incorrectly claimed Global had signed contracts" with several countries.[36]

---

[30] Am. Compl. ¶¶ 87-89; UpHealth Oct. Presentation 41, 43-45.

[31] Am. Compl. ¶ 91.  The plaintiffs say that they discovered this mismatch from internal chats between Needham junior analysts and by comparing a May 2020 presentation that broke out revenues by seven companies rather than four.  *Id.* ¶¶ 91-98.  The May 2020 presentation is not attached to either the original or amended complaint.

[32] *Id.* ¶ 105.  The June Presentation is also not attached to the original or amended complaint.

[33] *Id.* ¶¶ 106-07.

[34] *Id.* ¶ 100.

[35] *Id.* ¶ 109.

[36] *Id.* ¶ 108.  Neither the June Presentation nor the October Presentation disclosed that Kathuria was a partner in Glocal at the time of the acquisition; Glocal's insolvency as of October 2020; Glocal's default on several loans; Glocal's nonpayment of certain taxes,

Cloudbreak's Board of Directors and members relied on Katz's assurances and the June and October Presentations when they voted to approve the proposed transactions on November 20, 2020.[37]

### D.    The Business Combinations

The de-SPAC transaction proceeded in two steps under two agreements, both dated November 20, 2020.

First, under the UpHealth Business Combination Agreement (the "UpHealth BCA"), Gig2 would facilitate the merger of five Portfolio Companies (Thrasys, BHS, Innovations, TTC, and Glocal) into UpHealth Holdings.[38]  The UpHealth BCA was signed by Gig2, UpHealth Holdings, and UpHealth Merger Sub, Inc.[39]

Second, under the Cloudbreak Business Combination Agreement (the "Cloudbreak BCA"), UpHealth Holdings and Cloudbreak would be merged into Gig2 and brought public as UpHealth, Inc. ("New UpHealth").[40]  The Cloudbreak BCA was signed by Gig2, Cloudbreak, Cloudbreak Health Merger Sub, LLC, UpHealth Holdings, Kathuria, his cofounder, and Shareholder Representative

---

insurance, and customs duties; and the resignation of Glocal's auditor in 2019.  *Id.* ¶¶ 101, 109.

[37] *Id.* ¶¶ 90, 113, 116, 155, 160-61; Locke Affidavit ¶¶ 9-10.

[38] Verified Compl. (Dkt 1) ("Compl.") Ex. B ("UpHealth BCA") 1; *see also* Am. Compl. ¶ 14.

[39] UpHealth BCA 61-62 (signature pages); *see also* Am. Compl. ¶ 14.

[40] Compl. Ex. A ("Cloudbreak BCA"); *see also* Am. Compl. ¶¶ 7, 72.

8

Services, LLC.[41]  James Edwards—the CEO of Cloudbreak and nephew of plaintiff Edwards—signed on Cloudbreak's behalf.[42]  James Edwards had acted as "a representative for [the] [p]laintiffs and negotiated on behalf of [the] [p]laintiffs with [Kathuria and the Gig2 Defendants]."[43]  The Cloudbreak BCA also required the support of Cloudbreak's "Key Members," including plaintiffs Edwards and Bell and the entity through which Kayne held its interest.[44]

On June 2, 2021, Cloudbreak's Board and members "finalized their support of the Cloudbreak BCA, authorizing the transaction to move forward."[45]  Gig2's stockholders approved the business combinations with Cloudbreak and UpHealth Holdings a few days later.[46]  The transactions closed on June 9.[47]

---

[41] Cloudbreak BCA 62-65 (signature pages); *see also* Am. Compl. ¶ 14.

[42] Cloudbreak BCA 63; *see also* Am. Comp. ¶ 33 (describing the relationship between the plaintiff Edwards and the CEO).

[43] Am. Compl. ¶ 84; *see also infra* note 23 (defining the "Gig2 Defendants").

[44] Cloudbreak BCA § 7.03; *id.* at sched. 7.03; *see also id.* § 1.01 (defining "Key Members" to include those listed in the schedule).

[45] Am. Compl. ¶ 115.

[46] Transmittal Aff. of Kelly L. Freund in Supp. of Gig2 Defs.' Opening Br. in Supp. of Mot. to Dismiss Verified First Am. Compl. ("Freund Aff.") Ex. 6 (UpHealth, Inc. Form 8-K, filed June 9, 2021) Item 8.01 & Ex. 99.1; *see Omnicare,* 809 A.2d at 1167 (explaining that the court may take judicial notice of public SEC filings).

[47] Freund Aff. Ex. 6.

After closing, Katz became a managing member and co-chairman of New UpHealth.[48]  Kathuria and Dinu are also directors of New UpHealth, and Kathuria served as co-chairman until June 14, 2022.[49]

### E.    The Plaintiffs' Pursuit of New UpHealth Shares

Upon closing, plaintiffs Edwards, Bell, and Maron became New UpHealth stockholders.[50]  Unlike other parties to the Cloudbreak BCA, they were not subject to a contractual lockup and free to sell their shares upon receipt.[51]  The Cloudbreak BCA stated that "[w]ithin two (2) Business Days . . . after submission to the Exchange Agent of a Letter of Transmittal, . . . [the Cloudbreak members would] be entitled to receive . . . and [Gig2 would] cause the Exchange Agent to deliver, the applicable [merger consideration]" to members.[52]  The "Exchange Agent" was defendant Continental Stock Transfer & Trust Company.[53]

Edwards and Bell "repeatedly attempted to have Continental provide them with the necessary [documentation] so that they could access their shares."[54]  After

---

[48] Am. Compl. ¶ 20.

[49] *Id.* ¶¶ 21-22.

[50] *Id.* ¶¶ 14-15, 17.

[51] *Id.* ¶¶ 117-18.

[52] Cloudbreak BCA § 3.02(b); *see* Am. Compl. ¶ 119.

[53] Cloudbreak BCA § 3.02(a); *see* Am. Compl. ¶ 24 ("Continental is listed as [New] UpHealth's transfer agent.").

[54] Am. Compl. ¶ 120.

dedicating "considerable effort" to this process, Edwards and Bell submitted the necessary documentation on June 29 and June 28, respectively.[55] But they did not receive their shares within the two business days contemplated by the Cloudbreak BCA.[56] On July 9, they were told that the transfer process was being restarted.[57]

Edwards and Bell resubmitted letters of transmittal on July 14.[58] They received their shares "over a month after they initially asked Continental to provide them with the documentation to receive [them]."[59] Delivery of Maron's shares was likewise delayed.[60]

At the time of the merger, Hensel held Cloudbreak options.[61] Under the Cloudbreak BCA, Cloudbreak options were converted into New UpHealth options exercisable after a Form S-8 was filed.[62] The Form S-8 was filed on August 9.[63]

---

[55] *Id.* The plaintiffs make contradictory allegations on this topic. They allege both that Edwards and Bell submitted the necessary information in late June, and that Continental provided the documents required for submission "in late July." *Id.* I assume the reference to July is an error because the June submission dates accord with other allegations. *See id.* ¶¶ 121-22.

[56] *Id.* ¶ 120.

[57] *Id.* ¶ 121; *see supra* note 52 and accompanying text (noting the two-business-day condition in the Cloudbreak BCA).

[58] Am. Compl. ¶ 122.

[59] *Id.*

[60] *Id.* ¶ 124.

[61] *See supra* note 7 and accompanying text.

[62] Am. Compl. ¶¶ 130-32; Cloudbreak BCA § 3.01(a)(iv).

[63] Am. Compl. ¶ 132.

11

Although Hensel "satisf[ied] all Continental's conditions," his shares were not received until late September—or "over an entire month" later.[64]

## F. This Litigation

The plaintiffs filed suit on June 3, 2024.[65] An amended complaint was filed on October 11, 2024, which advances eight counts against four groups of defendants: Kathuria, the "Gig2 Defendants," Continental, and Needham.[66]

Claims for fraudulent inducement (Count I), negligent misrepresentation (Count III), and breach of the Delaware Deceptive Trade Practices Act (the "DTPA") (Count VII) are brought against Kathuria, the Gig2 Defendants, and Needham.[67] Separate civil conspiracy claims are brought against Kathuria, the Gig2 Defendants, and Needham (Count V) and Kathuria, the Gig2 Defendants, and Continental

---

[64] *Id.* Hensel asserts that Continental and UpHealth ignored several communications in which he asked for assistance in obtaining his shares. *Id.* ¶ 134.

[65] Dkt. 1. The original complaint named Kayne Anderson Capital Advisors, L.P. and Nathan Locke, a Managing Partner at Kayne and a Cloudbreak director, as defendants. *Id.* It did not name Needham. *Id.* Each of the defendants named in the complaint moved to dismiss. Dkts. 13-14, 21 (motions to dismiss); Dkts. 24-25, 29 (opening briefs). The plaintiffs agreed to dismiss Kayne and Locke, who submitted an affidavit in support of the amended complaint. Dkt. 38. The amended complaint, filed on October 11, names the current set of defendants. Dkt. 39.

[66] *See supra* notes 18 and 23 (defining "Needham" and the "Gig2 Defendants"). The plaintiffs refer to Kathuria and the Gig2 Defendants collectively as the "UpHealth Defendants." Am. Compl. 1. Because that term is inaccurate, I decline to adopt it.

[67] Am. Compl. ¶¶ 156-61, 170-75, 193-99. Counts VI through VIII are out of order in the Amended Complaint. I reference the counts according to the plaintiffs' numbering scheme, rather than in the order they are presented.

(Count VIII).[68]  A breach of contract claim (Count II) is brought against Gig2.[69]  A negligence claim (Count IV) is a brought against Continental.[70]  And an unjust enrichment claim (Count VII) is brought against the Sponsor and Katz.[71]

Each of the four defendant groups moved to dismiss.[72]  After briefing was complete,[73] I heard oral argument on April 4, 2025.[74]  The motions were taken under advisement.

## II.    ANALYSIS

The defendants' four motions to dismiss offer an assortment of arguments. The Gig2 Defendants assert that certain claims are untimely, that the plaintiffs failed to plead fraud with particularity, that the plaintiffs lack contractual standing under

---

[68] *Id.* ¶¶ 180-87; *see supra* note 67 (explaining the mislabeling of counts).

[69] Am. Compl. ¶¶ 162-69.

[70] *Id.* ¶¶ 176-79.

[71] *Id.* ¶¶ 188-92.

[72] Opening Br. in Supp. of Def. Continental's Mot. to Dismiss Pls.' First Am. Verified Compl. (Dkt. 53) ("Continental Opening Br."); Def. Kathuria's Opening Br. in Supp. of Mot. to Dismiss the First Am. Verified Compl. (Dkt. 55) ("Kathuria Opening Br."); Def. Needham's Opening Br. in Supp. of Mot. to Dismiss the First Am. Verified Compl. (Dkt. 57) ("Needham Opening Br."); Gig2 Opening Br.

[73] *See* Reply Br. in Further Supp. of Def. Continental's Mot. to Dismiss First Am. Verified Compl. (Dkt. 71) ("Continental Reply Br."); Gig2 Defs.' Reply Brief in Supp. of Mot. to Dismiss First Am. Verified Compl. (Dkt. 72) ("Gig2 Reply Br."); Def. Needham's Reply Br. in Further Supp. of Mot. to Dismiss First Am. Verified Compl. (Dkt. 73) ("Needham Reply Br."); Def. Kathuria's Reply Br. in Supp. of Mot. to Dismiss the First Am. Compl. (Dkt. 74) ("Kathuria Reply Br.").

[74] Dkt. 83; Tr. of Apr. 4, 2025 Oral Arg. on Defs.' Mots. to Dismiss (Dkt. 86) ("Hr'g Tr.").

the UpHealth BCA, and that the remaining claims against it are meritless. Kathuria and Needham separately and similarly argue that claims are time-barred, that the fraud allegations are inadequate, and that the claims against them are non-viable. As for Continental, it contends that the court lacks personal jurisdiction over it and that the sole claim against it fails.

I tackle these arguments categorically. First, I consider the threshold question of personal jurisdiction over Continental, which I resolve in Continental's favor. Second, I address whether the plaintiffs have standing to claim breach of the UpHealth BCA and conclude they do not. Third, I assess the timeliness of the plaintiffs' fraudulent inducement, negligent misrepresentation, and civil conspiracy claims—all of which are untimely. Finally, I evaluate the two remaining claims— for violation of the DTPA and unjust enrichment—and conclude that neither has merit.

### A.    Personal Jurisdiction Over Continental

Continental moved to dismiss under Court of Chancery Rule 12(b)(2), arguing that the court lacks personal jurisdiction over it.[75] Though the plaintiffs face the burden of establishing jurisdiction, they "need only make a prima facie showing of personal jurisdiction" and "the record is construed in the light most favorable to the

---

[75] Continental Opening Br. 7-12.

14

plaintiff[s]."[76]  The plaintiffs have not met their burden, despite this favorable standard.

Continental is a New York corporation with its sole place of business in New York.[77]  For the court to have jurisdiction over it, the plaintiffs must show either general jurisdiction—*i.e.*, that Continental was "essentially at home" in Delaware—or specific jurisdiction under Delaware's long-arm statute.[78]  The plaintiffs argue only that there is specific jurisdiction; they do not contest the absence of general jurisdiction.[79]

To resolve whether specific jurisdiction can be exercised over a nonresident, a two-step analysis is applied.  "The court must first determine that service of process

---

[76] *Crescent/Mach I P'rs, L.P. v. Turner*, 846 A.2d 963, 974 (Del. Ch. 2000); *Ryan v. Gifford*, 935 A.2d 265, 265 (Del. Ch. 2007).

[77] Am. Compl. ¶ 24; Aff. of Steven G. Nelson in Supp. of Continental Stock Transfer & Tr. Co.'s Mot. to Dismiss First Am. Verified Compl. (Dkt. 54) ("Nelson Aff.") ¶ 8 ("Continental does not maintain and has never maintained an office or other facility in Delaware; it has never owned or leased property there; none of its officers, directors, employees, or agents are domiciled in Delaware; and no meetings of Continental's board of directors or shareholders have ever been held there.").

[78] *See Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) ("A court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State. Specific jurisdiction, on the other hand, depends on . . . activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." (quoting *Int'l Shoe v. Washington*, 326 U.S. 310, 317 (2011))).

[79] Am. Compl. ¶ 26; Hr'g Tr. 79-80; *see also Genuine Parts Co. v. Cepec*, 137 A.3d 123, 135 (Del. 2016) (noting that "[i]n most situations where the foreign corporation does not have its principal place of business in Delaware, . . . Delaware cannot exercise general jurisdiction over the foreign corporation").

is authorized by statute and then must determine that the exercise of jurisdiction over the nonresident defendant comports with traditional due process norms of fair play and substantial justice."[80] The plaintiffs assert that the court has personal jurisdiction over Continental under Sections 3104(c)(1), (c)(2), and (c)(3) of the long-arm statute and the conspiracy theory of jurisdiction.[81] They fail to show that any of these means authorize service over Continental, or that due process is unoffended by the exercise of personal jurisdiction.

###### 1. Transacting Business or Contracting to Supply Services

Under Section 3104(c)(1) and (2), the court may exercise personal jurisdiction over a nonresident who "[t]ransacts any business or performs any character of work in [Delaware] or "[c]ontracts to supply services or things in [Delaware]."[82] The plaintiffs allege that Continental "transact[ed] business in the State of Delaware" and "provide[d] services and enter[ed] into contracts in Delaware."[83] No facts are pleaded in support of these conclusory statements.

Continental's motion to dismiss brief accompanied an affidavit from its President, which explains that Continental performed its work as transfer agent from

---

[80] *Ryan*, 935 A.2d at 265.

[81] Am. Compl. ¶ 26; Pls.' Answering Br. 68-69; *see also* 10 *Del. C.* § 3104(c)(1)-(3).

[82] 8 *Del. C.* § 3104(c)(1)-(2).

[83] Am. Compl. ¶ 26.

its sole place of business in New York.[84]  The agreement under which Continental performed transfer agent services for Gig2 a clause stating that New York courts have jurisdiction over any proceedings relating to Continental's services or arising from the agreement.[85]  That agreement identifies Continental's office in New York and Gig2's offices in California for notice purposes.[86]  Continental signed the transfer agent agreement in New York.[87]  Nothing in the agreement discusses services in Delaware, and Continental affirmed that it took no action in Delaware in furtherance of its work for Gig2.[88]

The plaintiffs insist that Continental's arguments should be disregarded because they are "based on facts not plead[ed] in the [Complaint]."[89]  Although "[g]enerally[] a plaintiff does not have the burden to plead in its complaint facts establishing a court's personal jurisdiction over defendant, . . . [w]hen a defendant

---

[84] Nelson Aff. ¶ 6.

[85] Nelson Aff. Ex. A ("Transfer Agent Agreement") § 17 ("In the event that any party hereto commences a lawsuit or other proceeding relating to or arising from this Agreement or services provided hereunder, the parties hereto agree that the United States District Court for the Southern District of New York shall have the sole and exclusive jurisdiction over any such proceeding.  If such court lacks federal subject matter jurisdiction, the parties hereto agree that the Supreme Court of the State of New York within New York County shall have sole and exclusive jurisdiction."); *see also* Nelson Aff. ¶ 4.

[86] Transfer Agent Agreement § 22.

[87] Nelson Aff. ¶ 7.

[88] *Id.* ¶ 9.

[89] Pls.' Answering Br. 67.

17

moves to dismiss a complaint pursuant to . . . Rule 12(b)(2), the plaintiff [then] bears the burden of showing a basis for the court's exercise of jurisdiction over the defendant."[90]  In ruling on a Rule 12(b)(2) motion, I may consider "the pleadings, affidavits, and any discovery of record."[91]

### 2.    Tortious Injury

Under Section 3104(c)(3), the court may exercise personal jurisdiction over a nonresident who "[c]auses tortious injury in [Delaware] by an act or omission in [Delaware]."[92]  The plaintiffs assert that Continental "acted with tortious negligence in failing to transfer UpHealth[] shares to [the p]laintiffs," "engaged in a civil conspiracy with the [Gig2 Defendants, UpHealth,] and Kathuria to violate Delaware statutory law," and "violated the [DTPA]."[93]

---

[90] *Harris v. Harris*, 289 A.3d 310, 325-26 (Del. Ch. 2023) (first citing *Benerofe v. Cha*, 1996 WL 535405, at *3 (Del. Ch. Sept. 12, 1996); then citing *Ryan*, 935 A.2d at 265).

[91] *Ryan*, 935 A.2d at 265; *see also Newspan, Inc. v. Hearthstone Funding Corp.*, 1994 WL 198721, at *3 (Del. Ch. May 10, 1994) ("A determination of whether personal jurisdiction exists over a party may be accomplished either after a preliminary hearing or based solely on submitted affidavits and other sworn documents or testimony.").

[92] 8 *Del. C.* § 3104(c)(3).

[93] Pls.' Answering Br. 68 (quoting Am. Compl. ¶¶ 176-79, 184-87, and 193-99); *see also* Am. Compl. ¶ 26 (arguing that the court "has personal jurisdiction over Continental . . . under 10 *Del. C.* § 3104 . . . [for] causing tortious injury through actions undertaken within the State").

18

There is, however, no allegation in the Amended Complaint that Continental violated a Delaware statute, including the DTPA.[94] Nor do plaintiffs allege that Continental injured them through an act or omission taken in this State. "In order to find jurisdiction under [Section] 3104(c)(3), the defendant must have caused a tortious injury *in Delaware* by its acts or omissions *in Delaware*."[95]

### 3. Conspiracy Theory of Jurisdiction

Finally, the plaintiffs invoke the conspiracy theory of jurisdiction.[96] They assert that jurisdiction exists because Continental conspired with Delaware entities, and the harmful effects of Continental's actions were felt by holders of a Delaware corporation's stock.[97]

---

[94] The claim for violation of the DTPA is brought only against Kathuria, the Gig2 Defendants, and Needham—not Continental. Am. Compl. ¶¶ 193-99; *see also supra* note 67 and accompanying text.

[95] *Abajian v. Kennedy*, 1992 WL 8794, at *10 (Del. Ch. Jan. 17, 1992); *see Ohrstrom v. Harris Tr. Co. of N.Y.*, 1998 WL 8849, at *3 (Del. Ch. Jan. 8, 1998) (holding that personal jurisdiction was lacking under Section 3104(c)(3) over a transfer agent because, even if the defendant injured plaintiffs in Delaware, all relevant acts occurred at the agent's office in New York).

[96] Pls.' Answering Br. 69 (arguing that "Continental conspired with [the Gig2 Defendants and Kathuria]" to "(a) violate 6 *Del. C.* § 8-401, 407; (b) induce a bad faith breach of the Cloudbreak and UpHealth BCAs so that plaintiffs could not access their shares and sell them; (c) wrongfully enrich Katz and Kathuria at the expense of [the p]laintiffs; [and] (d) engage in deceptive trade practices by deliberately delaying issuance of [the p]laintiffs' stock[] despite satisfaction of all conditions precedent").

[97] *Id.*

"The conspiracy theory of jurisdiction is not, strictly speaking, an independent jurisdictional basis" but "a shorthand reference to an analytical framework where a defendant's conduct that either occurred or had a substantial effect in Delaware is attributed to a defendant who would not otherwise be amenable to jurisdiction [here]."[98] Under the *Istituto Bancario* test, a plaintiff invoking the conspiracy theory of jurisdiction must "make a factual showing" of five elements:

> (1) a conspiracy existed; (2) the defendant was a member of that conspiracy; (3) a substantial act or substantial effect in furtherance of the conspiracy occurred in Delaware; (4) the defendant knew or had reason to know of the act in the forum state or that acts outside the forum state would have an effect in the forum state; and (5) the act in, or effect on, the forum state was a direct and foreseeable result of the conduct in furtherance of the conspiracy.[99]

"Delaware courts construe this test narrowly and require a plaintiff to assert specific facts, not conclusory allegations, as to each and every element."[100]

The plaintiffs fail to show the third element. The *Istituto Bancario* test "turns on the imputation to the [alleged] conspirator of meaningful activity on behalf of the

---

[98] *Comput. People, Inc. v. Best Int'l Grp., Inc*, 1999 WL 288119, at *5 (Del. Ch. Apr. 27, 1999).

[99] *Istituto Bancario Italiano SpA v. Hunter Eng'g Co. Inc.*, 449 A.2d 210, 225 (Del. 1982).

[100] *See Hartsel v. Vanguard Grp. Inc.*, 2011 WL 2421003, at *10 (Del. Ch. Jun. 15, 2011), *aff'd*, 38 A.3d 1254 (2012) (TABLE); *see Iotex Commc'ns, Inc. v. Defries*, 1998 WL 914265, at *7 (Del. Ch. Dec. 21, 1998) (describing the test as a "strict" one that requires "a plaintiff to satisfy each of the five elements").

conspiracy which occurred and caused effects in Delaware."[101] The purported conspiracy complained of in this case involves Continental's withholding stock from the plaintiffs. The Court of Chancery has observed that a New York-based transfer agent's alleged "failure to furnish [p]laintiffs th[eir] requested stock certificates" on behalf of a Delaware corporation did not involve any "act or omission that took place in Delaware."[102] No wrongdoing in Delaware is pleaded here.

The first element is also lacking. The plaintiffs advance only conclusory allegations that Continental was part of a conspiracy.[103] They plead no facts supporting a reasonable inference that Continental agreed to participate in a scheme to deprive the plaintiffs of their merger consideration. This claim rests solely on "information and belief."[104]

---

[101] *HMG/Courtland Props., Inc. v. Gray*, 749 A.2d 300, 307 (Del. Ch. Jan. 13, 1999); *see also Comput. People*, 1999 WL 288119, at *7 (concluding no personal jurisdiction under conspiracy theory when "there is no evidence (or even a claim) that any meaningful, 'substantial act or effect' in furtherance of th[e] conspiracy took place in Delaware" (citation omitted)).

[102] *See Ohrstrom*, 1998 WL 8849, at *3 (emphasis omitted).

[103] *See Allied Cap. Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1036 (Del. Ch. 2006) ("Under Delaware law, to state a claim for civil conspiracy, a plaintiff must plead facts supporting: (1) the existence of a confederation or combination of two or more persons; (2) that an unlawful act was done in furtherance of the conspiracy; and (3) that the conspirators caused actual damage to the plaintiff.").

[104] *See Griffin Corp. Servs., LLC v. Jacobs*, 2005 WL 2000775, at *6 (Del. Ch. Aug. 11, 2005) (rejecting a claim of purported interference "[u]pon information and belief" because "[s]uch a bald statement, without further factual allegations to support it, is merely conclusory and need not be accepted as true"); *see also In re Coca-Cola Enters., Inc.*, 2007 WL 3122370, at *3 (Del. Ch. Oct. 17, 2007) ("The Court will not . . . give any credence to conclusory allegations or wildly speculative and unreasonable conjecture." ); *In re*

21

### 4.    Due Process

The plaintiffs also have not shown that exercising jurisdiction over Continental comports with the Due Process Clause of United States Constitution. To satisfy the Due Process Clause, "a nonresident defendant must have sufficient 'minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'"[105] In making this assessment, "the Court must determine whether the non-resident's conduct and connection with Delaware is such that [it] reasonably would have anticipated being haled into court here."[106]

No facts support a reasonable inference that Continental—a New York corporation with its sole office in New York[107]—had enough contacts with Delaware to reasonably anticipate being sued here. The evidence demonstrates that

---

*Bioclinica, Inc. S'holder Litig.*, 2013 WL 5631233, at *10 (Del. Ch. Oct. 16, 2013) ("The Plaintiffs have the burden of bringing claims based on actual facts and reasonable inferences, rather than speculation."); *infra* note 129 and accompanying text (citing the Rule 12(b)(6) standard).

[105] *Matthew v. Fläkt Woods Grp. SA*, 56 A.3d 1023, 1027 (Del. 2012) (citing *Int'l Shoe*, 326 U.S. at 316).

[106] *Hartsel*, 2011 WL 2421003, at* 14; *see also Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *15 (Del. Ch. Aug. 26, 2005) ("In order to establish jurisdiction over a nonresident defendant, the nonresident defendant's contacts with the forum must rise to such a level that it should reasonably anticipate being required to defend itself in Delaware's courts.").

[107] *See supra* note 84 and accompanying text.

Continental does *no* business in Delaware. [108] Nothing in the Complaint suggests that Continental took a single action in Delaware. On similar facts, Vice Chancellor Glasscock held that Continental's contract with a Delaware corporation was not a sufficient minimum contact to support the exercise of personal jurisdiction.[109] Delaware has no particular interest in adjudicating this commercial dispute between the plaintiffs and Continental.[110]

*       *       *

Continental's motion to dismiss under Rule 12(b)(2) is granted and it is dismissed from this suit. As a result, the plaintiffs' negligence claim (Count IV) is dismissed. The plaintiffs' civil conspiracy claim (Count VI) is dismissed as to Continental, leaving the Gig2 Defendants and Kathuria as the remaining purported co-conspirators.[111]

---

[108] *See supra* notes 85-88 and accompanying text (quoting the Nelson affidavit).

[109] *Sorenson Impact Found. v. Cont'l Stock Transfer & Tr. Co.*, 2022 WL 986322, at *9-10 (Del. Ch. April 1, 2022) ("To the extent there is any connection between [Continental] and Delaware, it is due to its contract with . . . a Delaware corporation. This . . . is insufficient to confer personal jurisdiction over [Continental], as it fails to establish business connections between the agent and the State of Delaware.").

[110] *See Ohrstrom*, 1998 WL 8849, at *5 (holding that, even if the long-arm statute were satisfied, due process would not support personal jurisdiction over a transfer agent with no "continuous and systematic general business contacts with Delaware").

[111] *See supra* notes 103-104 and accompanying text (explaining that no conspiracy has been pleaded regarding the transfer of the plaintiffs' merger consideration); *infra* Section II.C (holding that this claim is untimely).

## B. Standing to Claim Breach of the UpHealth BCA

Count II is brought against Gig2 for breaching the UpHealth BCA, which permitted UpHealth Holdings stockholders to exchange their shares for New UpHealth stock within two business days of surrender.[112] The plaintiffs assert that Gig2 breached this provision by "instruct[ing] Continental to delay the payment of [the p]laintiffs' [p]er [s]hare [m]erger [consideration] to prevent [the p]laintiffs from liquidating their interest . . . ."[113]

Gig2 moves to dismiss the claim for lack of standing.[114] "The concept of 'standing' . . . refers to the right of a party to invoke the jurisdiction of a court to enforce a claim or redress a grievance."[115]

---

[112] Am Compl. ¶ 163; *see* UpHealth BCA § 3.02(b).

[113] Am. Compl. ¶ 167.

[114] Gig2 invokes Rule 12(b)(1) in its motion. *See* Gig2 Defs.' Mot. to Dismiss (Dkt. 59). Under Rule 12(b)(1), "[t]he Court of Chancery will dismiss an action for want of subject matter jurisdiction 'if it appears from the record that the Court does not have jurisdiction over the claim.'" *Acierno v. New Castle Cty.*, 2006 WL 1668370, at *3 (Del. Ch. June 8, 2006) (citing *AFSCME Locals 1102 & 320 v. City of Wilm.*, 858 A.2d 962, 965 (Del. Ch. 2004)); *see* Ct. Ch. R. 12(b)(1). Federal and state courts are "divided" on whether challenges to standing are properly brought under Rule 12(b)(1) (subject matter jurisdiction) or Rule 12(b)(6) (failure to state a claim). *See Appriva S'holder Litig. Co., LLC v. EV3, Inc.*, 937 A.2d 1275, 1283-84 (Del. 2007). Delaware courts have observed that "where . . . the issue of standing is . . . closely related to the merits, a motion to dismiss based on lack of standing is properly considered under Rule 12(b)(6) rather than Rule 12(b)(1)." *Id.* at 1284. Thus, the reasonable conceivability standard applies. *See supra* note 129 and accompanying text.

[115] *Stuart Kingston, Inc. v. Robinson*, 596 A.2d 1378, 1382 (Del. 1991).

"As a general rule, only parties to a contract and intended third-party beneficiaries may enforce an agreement's provisions."[116] None of the plaintiffs were parties to the UpHealth BCA.[117] And the UpHealth BCA disclaims any intent to convey third-party beneficiary status.[118]

The plaintiffs were Cloudbreak members—not UpHealth Holdings stockholders.[119] In their briefing, the plaintiffs insist that they meant to claim breach of the Cloudbreak BCA and cite allegations in the Complaint focusing on the mechanics of the Cloudbreak BCA.[120] The Amended Complaint belies this

---

[116] *NAMA Hldgs., LLC v. Related World Mkt. Ctr., LLC*, 922 A.2d 417, 434 (Del. Ch. 2007); *see also Indep. Realty Tr., Inc. v. USA Carrington Park 20, LLC*, 2022 WL 625293, at *3 (Del. Super. Mar. 1, 2022) (dismissing claims brough by an individual who was "neither a party to any of the relevant contracts, nor . . . own[ed] any security interest" in the company he sued).

[117] *See* UpHealth BCA 1 (listing as parties Gig2, UpHealth Merger Sub, Inc., and UpHealth Holdings).

[118] *See id.* § 6.03 ("This Agreement is not intended to confer any rights or benefits on any persons that are not party hereto other than as expressly set forth in [certain specified provisions]."); *see also id.* § 10.05 ("[N]othing in this Agreement, express or implied, is intended to or shall confer upon any other person any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement."); *Madison Realty P'rs 7, LLC v. Ag ISA, LLC*, 2001 WL 406268 (Del. Ch. April 17, 2001) (stating that to qualify as a third-party beneficiary, "(i) *the contracting parties must have intended that the third[-]party beneficiary benefit from the contract*, (ii) the benefit must have been intended as a gift or in satisfaction of a pre-existing obligation to that person, and (iii) the intent to benefit the third[-]party must be a material part of the parties' purpose in entering into the contract" (emphasis added)). The plaintiffs maintain that they are third-party beneficiaries of the Cloudbreak BCA. *See* Pls.' Answering Br. 69-75. I need not reach that arguments since I cannot ignore that they pleaded their claim based on the wrong agreement. *See infra* notes 120-126 and accompanying text.

[119] *See supra* notes 4-7 (noting the plaintiffs' membership interests in Cloudbreak).

[120] Pls.' Answering Br. 70 n.12 (citing Am. Compl. ¶¶ 117-18, 121).

recasting. It repeatedly states that Count II is based on breaches of the *UpHealth* BCA.[121] It also pleads purported breaches of the UpHealth BCA that cannot conceivably be read as breaches of the Cloudbreak BCA.[122]

Even if the reference to the UpHealth BCA were in error, the plaintiffs had the opportunity to cure it and declined to do so. Their original complaint contained the same allegations.[123] The Gig2 Defendants' motion to dismiss pointed out that the plaintiffs were not parties to the UpHealth BCA.[124] The plaintiffs stood on their

---

[121] Am. Compl. ¶ 163 ("The *UpHealth BCA* provided the holders of *UpHealth Holdings Common Stock* to surrender their *UpHealth Holdings Common Stock* along with a Letter of Transmittal and the required duly executed documents to an Exchange Agent—later designed as Continental—to receive their *UpHealth* stock certificates within 2 Business Days of surrender" (emphasis added)); *id.* ¶ 164 (alleging Continental was required to pay merger consideration "'in accordance with' the *UpHealth BCA*" (emphasis added)); *id.* ¶ 166 (alleging Continental did not pay "in accordance with *the UpHealth BCA*" (emphasis added)); *id.* ¶ 168 ("As a result, GigCapital2 has breached *the UpHealth BCA*" (emphasis added)); *id.* ¶ 169 ("GigCapital2's breach of the *UpHealth BCA* caused significant damages to Plaintiffs . . . ." (emphasis added)); *see also id.* ¶ 119 (referring to the UpHealth BCA).

[122] *E.g.*, *id.* ¶ 163 (repeatedly mentioning "UpHealth Holdings Common Stock" and "UpHealth stock certificates"). There is no reference to UpHealth Holdings common stock in the Cloudbreak BCA, which discusses Cloudbreak units. *See, e.g.*, Cloudbreak BCA § 1.01 (defining "Common Units").

[123] Compl. ¶¶ 232-39.

[124] Gig2 Defs.' Opening Br. in Supp. of their Mot. to Dismiss Verified Compl. (Dkt. 25) 33-37.

allegations, choosing to retain them in their amended Complaint.[125] They cannot now amend their pleading through their briefing.[126]

Accordingly, the plaintiffs' breach of contract claim in Count II is dismissed for lack of standing.

## C.     Timeliness of Claims

The Gig2 Defendants, Kathuria, and Needham argue that several claims against them should be dismissed in whole or in part as time barred.[127] Dismissal may be warranted where "the complaint itself alleges facts that show the complaint is filed too late."[128]

When reviewing a motion to dismiss under Rule 12(b)(6), Delaware courts "(1) accept all well pleaded factual allegations as true, (2) accept even vague allegations as 'well-pleaded' if they give the opposing party notice of the claim;

---

[125] *See* Ct. Ch. R. 15(a)(5)(A) ("If a party wishes to amend the party's complaint in response to a motion to dismiss under Rules 12(b)(6) . . . the party must amend the party's complaint—or seek leave to amend . . . before the party's response to the motion is due . . . ."); *In re Dow Chem. Co. Deriv. Litig.*, 2010 WL 66769, at *1 n.2 (Del. Ch. Jan. 11, 2010) ("A plaintiff must amend his complaint before standing on it in opposition to a motion to dismiss.").

[126] *See MCG Cap. Corp. v. Maginn*, 2010 WL 1782271, at *5 (Del. Ch. May 5, 2010) ("Having chosen [to stand on its complaint and answer the motion to dismiss], [the plaintiffs are] bound to the factual allegations contained in [their] complaint. [They] cannot supplement the complaint through [their] brief.").

[127] Gig2 Defs.' Opening Br. 15-20; Needham Opening Br. 20-24; Kathuria Opening Br. 19-22.

[128] *Kahn v. Seaboard Corp.*, 625 A.2d 269, 277 (Del. Ch. 1993).

27

[and] (3) draw all reasonable inferences in favor of the non-moving party."[129] Although this is a plaintiff-friendly standard, I am "not required to accept every strained interpretation of [the plaintiffs'] allegations."[130] Nor must I accept conclusory assertions "unsupported by allegations of specific facts."[131]

Five claims are at issue. They are: fraudulent inducement against the Gig2 Defendants, Kathuria, and Needham (Count I); negligent misrepresentation against the Gig2 Defendants, Kathuria, and Needham (Count III); civil conspiracy against the Gig2 Defendants, Kathuria, and Needham (Count V); and violation of the DTPA against the Gig2 Defendants, UpHealth, Kathuria, and Needham (Count VII) in

---

[129] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011).

[130] *Gen. Motors (Hughes)*, 897 A.2d at 168 (quoting *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001)).

[131] *In re Lukens Inc. S'holders Litig.*, 757 A.2d 720, 727 (Del. Ch. 1999), *aff'd sub nom. Walker v. Lukens, Inc.*, 757 A.2d 1278 (Del. 2000)

part.[132]   Each of these claims is subject to a three-year statute of limitations.[133]

"[C]laims filed beyond the statutory limitations period are presumptively barred."[134]

The plaintiffs maintain that their claims are timely for two reasons.  First, they argue that their claims accrued either on June 9, 2021 when the merger closed, or on June 2, 2021 when Cloudbreak's members voted for the merger.  I disagree and conclude that the claims accrued no later than November 2020.  Second, the plaintiffs assert that, even if more than three years passed before they filed suit, they

---

[132] The defendants argue that the DTPA claim is time-barred only as it relates to the alleged misstatements and omissions in the diligence presentations.  *See infra* Section II.D.1 (discussing the various DTPA allegations).

[133] *See* 10 *Del. C.* § 8106; *Solow v. Aspect Res., LLC*, 2004 WL 2694916, at *3 (Del. Ch. Oct. 19, 2004) (applying a three-year statute of limitations to fraudulent inducement claims); *Krahmer v. Christie's, Inc.*, 903 A.2d 773, 778 (Del. Ch. 2006) (stating that the "applicable statute of limitations" for negligent misrepresentation claims is a "three-year period"); *State ex rel. Brady v. Pettinaro Enters.*, 870 A.2d 513, 533 (Del. Ch. 2005) ("Actions by individual consumers under . . . the Deceptive Trade Practices Act are governed by a three-year statute of limitations."); *see also Tusha v. Pediatric Assocs., PA*, 2022 WL 823583, at *4 (D. Del. Mar. 18, 2022) (explaining that a civil conspiracy claim is "subject to the same three-year statute of limitations applicable to the underlying" tort claim).

[134] *In re Sirius XM S'holder Litig.*, 2013 WL 5411268, at *4 (Del. Ch. Sept. 27, 2013).  In this court, the applicable defense for the untimely commencement of an action for an equitable claim is laches.  *See Stevanov v. O'Connor*, 2009 WL 1059640, at *7 (Del. Ch. Apr. 21, 2009).  "[T]he statute of limitations will apply by analogy" and "claims filed beyond the statutory limitations period are presumptively barred."  *Sirius XM*, 2013 WL 5411268, at *4.  "[A] filing after the analogous statute of limitations has run cannot be justified except in the 'rare' and 'unusual' circumstance that a recognized tolling doctrine excuses the late filing."  *Id.*  When this court is "exercising ancillary jurisdiction over legal claims, [it] will apply the applicable statute of limitations found at law."  *Stevanov*, 2009 WL 1059640, at *7; *see also Kraft v. WisdomTree Invs., Inc.*, 145 A.3d 969, 983 (Del. Ch. 2016).

were not on inquiry notice until 2023 when certain documents became available through separate litigation. They have failed to show that any tolling doctrine applies, however. Because this suit was filed after the statute of limitations lapsed, the claims are time-barred.

### 1. Claim Accrual

Under Delaware law, "a cause of action 'accrues' under [10 *Del. C.* §] 8106 at the time of the wrongful act, even if the plaintiff is ignorant of the cause of action."[135] A fraudulent inducement claim accrues when the alleged misrepresentations were made.[136] That is, a claim for fraudulently inducing a party to enter a contract accrues no later than the date of the contract's execution.[137] A

---

[135] *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312 (Del. 2004); *see Coca-Cola*, 2007 WL 3122370, at *5 ("[A] plaintiff's cause of action accrues at the moment of the wrongful act—not when the harmful effects of the act are felt—even if the plaintiff is unaware of the wrong.").

[136] *See Winkelvoss Cap. Fund, Ltd. Liab. Co. v. Shaw*, 2019 WL 994534, at *5 (Del. Ch. Mar. 1, 2019); *Jeter v. Revolutionwear, Inc.*, 2016 WL 3947951, at *9 (Del. Ch. July 19, 2016).

[137] *See Puig v. Seminole Night Club, LLC*, 2011 WL 3275948, at *3-4 (Del. Ch. July 29, 2011) ("[T]he claims raised in the Amended Complaint must have accrued by September 22, 2004—the date that Puig entered into the SPA and the LLC Agreement . . . ."); *Pivotal Payments Direct Corp. v. Planet Payment, Inc.*, 2020 WL 7028597, at *5 (Del. Ch. Nov. 3, 2020) ("A claim for fraudulent inducement accrues when the fraudulent statements were made, which must be on or before the date when the parties entered into the contract."); *Optical Air Data Sys., LLC v. L-3 Commc'ns Corp.*, 2019 WL 328429, at *6 (Del. Super. Jan. 23, 2019) (explaining that for a fraudulent inducement claim, "[a] plaintiff cannot rely on a misrepresentation made after the parties executed [their] agreement"); *see also Jeter*, 2016 WL 3947951, at *9 (evaluating "when the alleged contract-inducing misstatements were made").

negligent misrepresentation claim similarly accrues when the challenged statements are made.[138] A civil conspiracy claim also "runs from the time of the overt act which is alleged to have caused the damages complained of."[139]

The plaintiffs' fraud, negligent misrepresentation, and related civil conspiracy claims are based on alleged misrepresentations and omissions that induced the plaintiffs to approve the Cloudbreak BCA.[140] The Cloudbreak BCA was executed on November 20, 2020.[141] The Cloudbreak member vote and closing occurred later, in June 2021.[142]

The fraudulent misrepresentations complained of are presentations, financial information, and oral representations made by the defendants before November 2020. The plaintiffs' main focus is on statements in the October and June Presentations.[143] More broadly, according to the Complaint, "[t]hroughout August,

---

[138] *See Krahmer*, 903 A.2d at 778 (explaining that a negligent misrepresentation claim accrues "at the time of the wrongful act," *i.e.*, on the date of the alleged misrepresentation).

[139] *Glassberg v. Boyd*, 116 A.2d 711, 717 (Del. Ch. 1955); *see also Freedman v. Beneficial Corp.*, 406 F. Supp. 917, 924 (D. Del. 1975).

[140] *See* Am. Compl. ¶¶ 158, 161.

[141] *See* Cloudbreak BCA (cover page).

[142] Am. Compl. ¶ 115; *see also supra* notes 45-47 and accompanying text.

[143] Am. Compl. ¶ 83 ("At the root of Defendants' fraudulent inducements were materially false investor presentations shared with Cloudbreak."); *id.* ¶ 84 ("Throughout 2020, Katz, Kathuria, and the other [Gig2] Defendants provided Plaintiffs with presentations and analyses that falsely showed each of the [Portfolio] Companies were in strong financial condition and were positioned for significant future success."); *see also id.* ¶¶ 85-109.

September, and October, Katz, Kathuria, and Needham repeatedly claimed that Glocal, Thrasys, and the other [Portfolio] [C]ompanies were in strong financial shape and were, in fact, healthier than Cloudbreak."[144]  "At the same time, Katz repeatedly informed [the plaintiffs and Kayne] that he had diligenced the deal."[145] The diligence presentations allegedly plagued by misrepresentations and omissions were given to the plaintiffs in or before October.[146]  No later fraudulent statements are mentioned in the Complaint.  The relevant claims therefore accrued by November 2020.[147]

The plaintiffs refute that their claims accrued that early.  They cite two alternate dates: the June 9, 2021 closing and the June 2, 2021 date of the Cloudbreak member vote.  Neither event changes the claims' untimeliness because the purported fraudulent and misleading statements were made months prior.

### a. Date of Closing

The business combination of Cloudbreak and Gig2 closed on June 9, 2021.[148] The plaintiffs assert that their claims accrued then because "a claim for fraudulent

---

[144] *Id.* ¶ 110.

[145] *Id.* ¶ 111.  The plaintiffs emphasize their reliance on these representations.  *See supra* note 37 and accompanying text.

[146] *See supra* notes 28-36 and accompanying text (detailing alleged misrepresentations in the June and October Presentations).

[147] *See supra* note 137 and accompanying text.

[148] *See supra* note 47 and accompanying text.

inducement cannot be ripe [when] the induced transaction has not yet occurred."[149]

They chiefly rely on *Price v. Wilmington Trust*, which held that "a statute of limitations will not begin to run until all of the elements of the claim have occurred."[150] Based on that statement, they assert that they could not have been injured by their reliance on the defendants' misstatements or omissions until closing.[151]

The plaintiffs take the holding in *Price* out of context. Immediately after the text highlighted by the plaintiffs, it states that "[t]he pertinent question then becomes when . . . *the wrongful conduct occurred* . . . where there are alleged to be numerous repeated wrongs of similar, if not same, character over an extended period."[152] The court explained that each completed wrong triggered a three-year limitations period.

---

[149] Pls.' Answering Br. 9.

[150] *Id.* (citing 1995 WL 317017, at *2 (Del. Ch. May 19, 1995)).

[151] *Id.* ("[A] fraudulent inducement claim accrues for purposes of laches when the actionable misstatement or omission was relied upon *to a plaintiff's detriment*."); *see ABRY P'rs V, L.P. v. F & W Acq. LLC*, 891 A.2d 1032, 1050 (Del. Ch. Feb. 14, 2006) (explaining that the five elements of common-law fraud are "(1) the defendant falsely represented or omitted facts that the defendant had a duty to disclose; (2) the defendant knew or believed that the representation was false or made the representation with a reckless indifference to the truth; (3) the defendant intended to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted in justifiable reliance on the representation; and (5) the plaintiff was injured by its reliance").

[152] *Price*, 1995 WL 317017, at *2 (emphasis added).

It did not confront the question of claim accrual in the merger context, or even when the purported injury occurs in that circumstance.[153]

The plaintiffs also argue that "accrual for tort claims arising out of a [complex business] transaction occurs at the transaction's closing."[154] That may be true where the purported fraud is contained within the transaction agreement itself, as in the cases cited by the plaintiffs.[155] But the plaintiffs do not claim intra-contractual fraud or negligent misrepresentations in the Cloudbreak BCA.[156] They address misrepresentations and omissions orally or in presentations delivered before the Cloudbreak BCA was signed in November 2020.[157] Thus, the plaintiffs' claims did not accrue at closing.

---

[153] *Price* observed that a statute of limitations only "begin[s] to run [when] the beneficiary knew or had good reason to know of the allegedly wrongful conduct." *Id.* This is a separate question from the point of injury and better addressed in the discussion of tolling below. *See infra* Section II.C.2.

[154] Pls.' Answering Br. 9.

[155] *See Kilcullen v. Spectro Sci., Inc.*, 2019 WL 3074569, at *7 (Del. Ch. July 15, 2019) ("Where a fraud claim alleges false representations and warranties in a purchase agreement, the fraud claim accrues at closing."); *Certainteed Corp. v. Celotex Corp.*, 2005 WL 217032, at *29 (Del. Ch. Jan. 24, 2005) ("CertainTeed has also pled that Celotex committed fraudulent misrepresentation by providing false representations and warranties of the conditions of the [loan f]acilities. Even assuming these claims are viable, . . . [they] are also subject to a three-year statute of limitations, and whether treated as breach of contract or as tort, the accrual date as to all of these claims was the date of [c]losing."); *see also* Pls.' Answering Br. 9-10.

[156] Nor could they. The Cloudbreak BCA contains no representations or warranties regarding UpHealth or Gig2's due diligence into UpHealth.

[157] *See supra* notes 28-37 and accompanying text.

34

b.     Date of Member Vote

The plaintiffs argue in the alternative that their claim accrued on June 2, 2021—when Cloudbreak's members voted on the transactions contemplated by Cloudbreak BCA.[158]   Because the member vote was required for Cloudbreak to participate in the de-SPAC, the plaintiffs insist that their "reliance on the . . . misstatements were effectuated through the decisive member vote."[159]

This position finds no support in the Complaint or the law.[160]   The alleged wrongful acts are fraudulent or misleading statements predating the Cloudbreak BCA's execution in November 2020.[161]   The plaintiffs have not pleaded that they relied on post-November 2020 statements in casting their votes.   That the "damage-causing event (i.e., the [de-]SPAC)" could not have occurred without the member

---

[158] Pls.' Answering Br. 10-11; *see supra* note 45 and accompanying text.

[159] Pls.' Answering Br. 11.

[160] Kathuria and the Gig2 Defendants assert that the plaintiffs' claims could not have accrued upon the member vote for more reasons.  Cloudbreak's "Key Members," including Bell and Edwards, were bound by Member Support Agreements.  *See* Gig2 Defs.' Opening Br. 13-14, 18-20; Freund Aff. Ex. 4 at 2, 7, sch. 7.03.  Cloudbreak's LLC Agreement also contained a drag-along right.  *See* Kathuria's Opening Br. 20-21; Freund Aff. Ex. 1 (Cloudbreak LLC Agreement) § 9.07.  Regardless of whether the member vote was predetermined, the Complaint cites no statements after November 2020 relied on by the plaintiffs in voting on the merger.

[161] The plaintiffs' original complaint discussed presentations that post-dated the November 20, 2020 vote.  Compl. ¶¶ 81-82.  Those allegations were dropped from the amended Complaint.

35

vote is irrelevant.[162] "A fraud claim accrues, and the statute of limitations begins to run, at the moment of the wrongful act and not when the effects of the act are felt."[163]

## 2. Tolling of the Statute of Limitations

The plaintiffs next submit that they lacked inquiry notice until 2023 when "a trove of confidential and proprietary internal documents" were produced in unrelated litigation between Needham and UpHealth.[164] Before then, the plaintiffs maintain they were unaware that the June and October Presentations were false.[165] They relied on "assurances from Kathuria and Needham regarding the [presentations'] accuracy" and Katz's statement that he had independently diligenced UpHealth and its financial information.[166]

Delaware courts recognize three doctrines that may toll the statute of limitations: (1) fraudulent concealment; (2) inherent unknowable injury; and

---

[162] Pls.' Answering Br. 12.

[163] *Kilcullen*, 2019 WL 3074569, at *7.

[164] Pls.' Answering Br. 14-15.

[165] *Id.* at 17 ("[The Gig2 Defendants, Kathuria, and Needham] provided [the p]laintiffs with multiple presentations during the diligence process which made direct representations regarding the [Portfolio] Companies' revenue figures, business contracts, and operations."); Am. Compl. ¶ 153 ("As part of the conspiracy, [Kathuria and the Gig2 Defendants] went to great lengths to create the appearance of a financially viable public company resulting from the series of business combinations through fraudulent financial reporting and projections."); *see also id.* ¶¶ 77-81, 83.

[166] Pls.' Answering Br. 17; *see supra* note 25 and accompanying text.

(3) equitable tolling.[167]  The doctrines are similar in that each "permits tolling of the limitations period where the facts underlying a claim were so hidden that a reasonable plaintiff could not timely discover them."[168]

There are also meaningful differences.  Fraudulent concealment involves "an affirmative act of concealment by a defendant . . . intended to put a plaintiff off the trail of inquiry."[169]  Under the "inherently unknowable injuries" doctrine, "there must have been no observable or objective factors to put a party on notice of an injury, and plaintiffs must show that they were blamelessly ignorant of the act or omission and the injury."[170]  And equitable tolling applies in the event of wrongful self-dealing, where a plaintiff reasonably relies on the competence and good faith of a fiduciary—even in the absence of fraudulent conduct.[171]

---

[167] *Krahmer*, 903 A.2d at 778; *In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *5 (Del. Ch. July 17, 1998).

[168] *Dean Witter*, 1998 WL 442456, at *5.

[169] *Id.* (citing *Halpern v. Barran*, 313 A.2d 139, 143 (Del. Ch. 1973)); *see also Firemen's Ret. Sys. v. Sorenson*, 2021 WL 4593777, at *10 (Del. Ch. Oct. 5, 2021) (noting that an affirmative act is required for tolling under the fraudulent concealment doctrine and that "mere silence is insufficient").

[170] *Dean Witter*, 1998 WL 442456, at *5; *see also Wal-Mart Stores*, 860 A.2d at 319 (citation omitted).

[171] *Dean Witter*, 1998 WL 442456, at *6.

The plaintiffs conflate these distinct tolling doctrines.[172]  Substantively, their

theory most aligns with inherently unknowable injuries.[173]  They posit that, because

they relied on representations by Katz and others, the state of UpHealth and the

Portfolio Companies "was entirely in [the d]efendants' hands" and undiscoverable

"[i]n the usual course of events"—*i.e.*, the intervening Needham litigation.[174]  This

argument draws from the fact that the Portfolio Companies "were private, did not

---

[172] *See* Am. Compl. ¶ 153 ("[Kathuria and the Gig2 Defendants] affirmatively and *fraudulently concealed* their unlawful scheme, course of conduct, and conspiracy from Plaintiffs." (emphasis added)); *but see* Pls.' Answering Br. 16 ("If a reasonable inference can be made [that] the plaintiff was blamelessly ignorant of the 'wrongful acts' until a time that is within the applicable statute of limitations, that is all that is required at the motion to dismiss stage." (citing *Wal-Mart Stores*, 860 A.2d at 319)); *id.* at 20-21 (analogizing to a case in which tolling applied under the "discovery rule," which is often associated in the case law with the "inherently unknowable injuries" doctrine).

[173] As discussed above, the main difference between fraudulent concealment and inherently unknowable injuries is that the former requires "an affirmative act" taken to obscure the truth.  *See supra* notes 169-170 and accompanying text.  Even if the plaintiffs allege fraudulent concealment—rather than an inherently unknowable injury—they plead no affirmative act that could support tolling under that doctrine.  In their brief, the plaintiffs assert that the "active manipulation of documents" is such an affirmative act.  Pls.' Answering Br. 23.  But they do not allege with particularity any manipulation "designed or intended to prevent . . . the discovery of facts giving rise to the fraud claim." *Wolstenholme v. Hygienic Exterminating Co.*, 1988 WL 90575, at *3 (Del. Super. Aug. 19, 1988) (citation omitted); *see also Halpern*, 313 A.2d at 143 (explaining that a plaintiff invoking fraudulent concealment must "plead with particularity the circumstances constituting fraud" under Rule 9(b)").  They also argue that Katz's statement that he "diligenced the [Portfolio] Companies *on behalf of Cloudbreak's Board* when he had not" supports fraudulent concealment.  Pls.' Answering Br. 23 (emphasis added).  But the Amended Complaint does not plead with particularly that Katz ever acted on behalf of Cloudbreak.  There is no allegation that Katz concealed his role as Gig2's agent.

[174] Pls.' Answering Br. 18.

engage in any meaningful public reporting, and many were headquartered internationally."[175]

The inherently unknowable injury doctrine is a "narrowly confined" exception to the statute of limitations.[176] It applies only "where it would be practically impossible for a plaintiff to discover the existence of a cause of action."[177] "No objective or observable factors may exist that might have put the plaintiffs on notice of an injury, and the plaintiffs bear the burden to show that they were 'blamelessly ignorant' of both the wrongful act and the resulting harm."[178] The doctrine supports tolling until plaintiffs are on inquiry notice—when "person[s] of ordinary intelligence and prudence [have facts sufficient to place them] on inquiry which, if pursued, would lead to the discovery" of the injury.[179]

Vice Chancellor Lamb's decision in *Krahmer v. Christie's Inc.* provides useful guidance for assessing whether the doctrine is implicated.[180] There, he

---

[175] *Id.*

[176] *Kaufman v. CL McCabe & Sons, Inc.*, 603 A.2d 831, 835 (Del. 1992); *see also Tropical Nursing, Inc. v. Accord Health Serv., Inc.*, 2006 WL 3604783, at *3 (Del. Super. Dec. 7, 2006) (explaining that the doctrine applies "only in exceptional circumstances in which discovery of the existence of the cause of action at the time of injury was a practical impossibility").

[177] *In re Tyson Foods, Inc.*, 919 A.2d 563, 584 (Del. Ch. 2007).

[178] *Id.* at 584-85.

[179] *Dean Witter*, 1998 WL 442456, at *7.

[180] 903 A.2d 773 (Del. Ch. 2006).

addressed an issue "of first impression in Delaware—whether the inherently unknowable injuries rule applies where an auction house sells an allegedly fake work of art to one who has no specific reason to question its authenticity until long after the three-year statute of limitations has expired."[181]  Resembling the allegations here, the plaintiffs in *Krahmer* claimed that Christie's defrauded them by "intentional[ly] misrepresent[ing] [] the authenticity" of a painting they bought and by appraising it at a high value.[182]  The court sided with Christie's, holding that Christie's "interests [were] aligned with the consignors not the purchasers" and that the plaintiffs could have discovered the truth about the painting's authenticity by obtaining an appraisal from another art expert.[183]

Like the purchasers in *Krahmer* who were owed no duty by Christie's, the plaintiffs and Cloudbreak were owed no duty by the Gig2 Defendants, Needham, or Kathuria—their counterparties in the negotiations.  Katz was acting on behalf of Gig2, and Kathuria and Needham were acting on behalf of UpHealth.[184]

---

[181] *Id.* at 780.

[182] *Id.* at 777.

[183] *Id.* at 781.

[184] The plaintiffs rely in part on *BTIG, LLC v. Palantir Technologies*, where the court held that the statute of limitations was tolled until "previously secret documents" became public, which revealed an alleged scheme to undercut BTIG's brokered deal of Palantir stock.  Pls.' Answering Br. 20 (citing 2020 WL 95660, at *2, 5 (Del. Super. Jan. 3, 2020)).  There is a critical difference, though.  The court in *BTIG* observed that agreements requiring BTIG to disclose to Palantir any brokered deal of Palantir stock "present[ed] a situation that seemingly involves good faith and fair dealing," noting that it would be "strange" to allow

Additionally, as in *Krahmer*, nothing prevented the plaintiffs from doing their own diligence into the Portfolio Companies and requesting additional information on their financial wellbeing. Their failure to do so does not make any injury suffered inherently unknowable.

The disclaimers in the June and October Presentations also would have put the plaintiffs on inquiry notice that Needham had not "diligenced" the information provided.[185] The October Presentation stated that Needham was not responsible for its veracity and that the information provided "had been prepared by management of [UpHealth] and involve[d] significant elements of subjective judgment and analysis, which may or may not be correct."[186] The June Presentation included a similar warning.[187] These disclaimers would have put the plaintiffs on notice of potential inaccuracies in the presentations and that they should conduct their own analysis.[188]

---

Palantir to "use this information, with impunity, and negotiate side deals that cut out the disclosing parties." 2020 WL 95660, at *6. This reasoning was based on a duty Palantir purportedly owed to BTIG. *Id.* The court contrasted that situation to the one in *Krahmer* "where the auction house's only duty was to the owner of the artwork and not to the [purchasers]." *Id.* at *5. In this way, the present case is more like *Krahmer* than *BTIG*. The defendants were acting on behalf of a counterparty bargaining across the table from Cloudbreak and the plaintiffs.

[185] Pls.' Answering Br. 20.

[186] *See* UpHealth Oct. Presentation (Disclaimer & Process Overview).

[187] *See* Needham Opening Br. 8-9.

[188] *See, e.g., Vichi v. Koninklijke Philips Elecs., N.V.*, 85 A.3d 725, 790-91 (Del. Ch. 2014) (holding that plaintiff was on inquiry notice of its claim that defendant fraudulently induced

*          *          *

The plaintiffs' claims in Counts I, III, V, and VI (insofar as it relates to alleged misrepresentations and omissions in diligence materials) accrued no later than November 2020. The plaintiffs were on inquiry notice by that time. But this lawsuit was not filed until June 3, 2024—more than three years later. These claims are dismissed as untimely.

## D.     The Remaining Claims

With several claims dismissed for untimeliness (Counts I, III, V, and part of VIII), lack of standing (Count II), or absence of personal jurisdiction over Continental (Count IV), just three remain. They are: (1) the timely aspects of the DTPA claim again the Gig2 Defendants, UpHealth, Kathuria, and Needham (Count VIII); (2) civil conspiracy against the Gig2 Defendants, UpHealth and Kathuria (Count VI); and (3) unjust enrichment against the Sponsor and Katz (Count VII). Each of these claims is subject to the reasonable conceivability standard.[189] None meet it.

---

it to enter a loan agreement by falsely promising to stand behind a joint venture, where the loan documents included "express statements" that the defendant was not a guarantor to loan).

[189] The applicable pleading standard is explained above. *See supra* notes 129-131 and accompanying text.

1. The DTPA Claim

The DTPA prohibits participation in a "deceptive trade practice . . . in the course of a business, vocation, or occupation."[190] Its purpose is "to prevent 'patterns of deceptive conduct,' rather than isolated incidents."[191] A DTPA claim cannot be arise from wrongdoing "in the past" that is not ongoing.[192] A plaintiff must demonstrate "a reasonable apprehension of a future wrong" that could support injunctive relief.[193]

The DTPA claim here concerns actions taken years ago.[194] The plaintiffs state that "[Kathuria and the Gig2 Defendants] Defendants engaged in deceptive trade practices by making false representations and omissions of material facts in connection with and regarding the sponsor and management services . . . in connection with the merger."[195] They identify four such matters: (1) "[f]alse

---

[190] 6 *Del. C.* § 2532; *see also* Am. Compl. ¶ 194.

[191] *EDIX Media Grp., Inc. v. Mahani*, 2006 WL 3742595, at *12 (Del. Ch. Dec. 12, 2006) (citation omitted); *see also Coretel Am., Inc. v. Oak Point P'rs, LLC*, 2022 WL 2903104, at *11 (Del. Super. July 21, 2022).

[192] *Coretel*, 2022 WL 2903104, at *11 (dismissing a DTPA claim based on past conduct); *see also Registered Agent Sols., Inc. v. Corp. Serv. Co.*, 2022 WL 911253, at *6 (D. Del. Mar. 28, 2022).

[193] *Coretel*, 2022 WL 2903104, at *9 (citing *Agilent Techs., Inc. v. Kirkland*, 2009 WL 119865, at *10 (Del. Ch. Jan. 20, 2009)); *see also Agilent*, 2022 WL 2903104, at *10 (explaining that "relief under the statute is dependent on the plaintiff's entitlement to injunctive relief").

[194] Am. Compl. ¶¶ 195-96.

[195] *Id.* ¶ 195.

43

statements regarding the financial stability and projected growth of UpHealth's subsidiaries"; (2) the "[f]ailure to disclose material adverse information regarding the financial condition and business operations of UpHealth's subsidiaries"; (3) "[d]eliberate delay and obstruction in providing the necessary documentation for Plaintiffs to exercise their options and sell their shares"; and (4) "[m]isleading statements and omissions about the timing and filing of the [Form] S-8 registration statement."[196] The claim is time-barred insofar as it rests on the first two purported deceptions.[197]

The plaintiffs never identify which of the twelve types of "deceptive trade practices" in the statute are implicated.[198] Of the two "broad areas" encompassed by the statute—"(i) false or misleading use of trademarks or other trade identification and (ii) deceptive advertising"[199]—their allegations fall closer to the latter category. It is a stretch to say that either category applies with respect to the third and fourth alleged misstatements or omissions highlighted by the plaintiffs.

---

[196] *Id.* The plaintiffs caveat this allegation by stating that their claim is not expressly limited to these four identified misrepresentations or omissions. *Id.* But they do not explain what other problematic trade practices give rise to their claim.

[197] *See supra* Section II.C.

[198] *See* 6 *Del. C.* § 2532(a).

[199] *See Del. Solid Waste Auth. v. E. Shore Env't, Inc.*, 2002 WL 537691, at *4 (Del. Ch. Mar. 28, 2002).

Even if deceptive advertising were pleaded, however, the claim would fail because the plaintiffs did not plead a "pattern of conduct or any reasonable apprehension of a future wrong."[200] For the portion of the claim that is not time-barred, the challenged conduct concerns the plaintiffs' receipt of merger consideration. The pertinent events are isolated ones in the past; none involve continuing harm. The plaintiffs argue otherwise because New UpHealth recently profited by selling its Cloudbreak subsidiary to a private equity firm, which they say shows "the theft of Cloudbreak, and [that] Defendants['] enrichment as a result of that theft, is continuing to present day."[201] But they cannot explain how this sale—or any "theft"—reveals an "pattern" of deceptive conduct.[202] If anything, it confirms that the alleged misconduct is in the past.[203]

The DTPA claim is therefore dismissed.

---

[200] *Tycon Peak Cap. Mgmt., LLC v. Mobile Invs. Investco, LLC*, 2022 WL 34688, at *28 (Del. Ch. Jan. 4, 2022) (dismissing a DTPA claim where the plaintiff "d[id] not identify a specific statutory provision in the DTPA that [the defendants] breached" and failed to plead future harm).

[201] Pls.' Answering Br. 75-76.

[202] *See supra* note 131 and accompanying text (explaining that there is no requirement that the court accept conclusory assertions "unsupported by allegations of specific facts" on a motion to dismiss); *Lukens*, 757 A.2d at 727.

[203] *See* Am. Compl. ¶¶ 122, 124, 132, 148.

### 2. Civil Conspiracy Regarding Share Transfer

The plaintiffs aver that the Gig2 Defendants, Kathuria, and Continental engaged in a civil conspiracy to "inhibit and delay [their] contractual right to obtain their [p]er [s]hare [m]erger [c]onsideration to protect the perceived financial health of UpHealth."[204]  Because the court lacks personal jurisdiction over Continental,[205] I consider the claim as alleged against the remaining defendants.  This claim has several defects and must be dismissed.

"Civil conspiracy is not an independent cause of action; it must be predicated on an underlying wrong."[206]  The alleged underlying act is the defendants' "wrongful[] enrich[ment] . . . through breach of the UpHealth BCA."[207]  But "unless the breach also constitutes an independent tort, a breach of contract cannot constitute an underlying wrong on which a claim for civil conspiracy could be based."[208]

Even if an underlying tort were present, there are no well-pleaded facts from which it can be reasonably inferred that a meeting of the minds was reached to deny

---

[204] *Id.* ¶ 186.

[205] *See supra* Section II.A.

[206] *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 893 (Del. Ch. 2009).

[207] Am. Compl. ¶ 185.

[208] *Kuroda, L.L.C.*, 971 A.2d at 893.  The plaintiffs were not parties to the UpHealth BCA, and the UpHealth BCA expressly disclaimed any intent to convey third-party beneficiary status.  *See supra* notes 117-118 and accompanying text. A civil conspiracy claim is not a back door for a contractual non-party to qualify as a third-party beneficiary.  *See Sinex v. Bishop*, 2005 WL 3007805, at *3 (Del. Super. Oct. 27, 2005).

the plaintiffs timely delivery of their merger consideration. The sole alleged participation in the supposed conspiracy is: "[u]pon information and belief, [Kathuria and the Gig2 Defendants] instructed Continental to delay the payment" to the plaintiffs.[209] This conclusory and speculative assertion cannot sustain a claim.[210]

### 3. Unjust Enrichment

The last remaining claim is for unjust enrichment against the Sponsor and Katz. The plaintiffs posit that the Sponsor and Katz's "wrongful conduct" destroyed the value of the plaintiffs' investment in Cloudbreak, making it inequitable for those defendants to retain a benefit.[211]

Unjust enrichment is the "unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience."[212] The plaintiffs must plead (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, and (4) the absence of justification.[213] The third element is lacking.

---

[209] Am. Compl. ¶ 167.

[210] *See supra* note 104 (citing cases observing that conclusory allegations cannot sustain a claim).

[211] Am. Compl. ¶¶ 188-92.

[212] *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010).

[213] *Capano v. Ecofibre Ltd.*, 2025 WL 419494, at *1 (Del. Ch. Feb. 5, 2025).

The alleged impoverishment is the plaintiffs' loss of "significant value in [their] investment in Cloudbreak."[214] The Sponsor and Katz (through his control of the Sponsor) were allegedly enriched through two forms of consideration: (1) the "Sponsor Shares" received in the SPAC for a nominal price and (2) management fees charged in searching for a target.[215] Yet the plaintiffs plead no a link between the impoverishment and enrichment. Any alleged tie is attenuated at best.

The plaintiffs likely cannot make this connection because they are not associated with Katz or the Sponsor.[216] "Although the doctrine of unjust enrichment is one of 'substantial flexibility,' it is axiomatic that there must be some relationship between the parties."[217] The plaintiffs must "show[] that the defendant[s] w[ere] unjustly enriched by the plaintiff[s] who acted *for the defendant[s'] benefit*."[218]

---

[214] Am. Compl. ¶ 189.

[215] *Id.* ¶ 190; *see id.* ¶ 65 (defining "Sponsor Shares" and "Management Fees"). Aside from this description of SPACs' practices generally, the plaintiffs do not allege that the Sponsor ever received management fees.

[216] The plaintiffs allege that the unjust enrichment claim survives because Edwards voted for the merger during the UpHealth Board vote. Pls.' Answering Br. 63-64. This purported "enrichment" is unpleaded in the Complaint. Regardless, Edwards's vote as an UpHealth director is distinct from the impoverishment he allegedly suffered as a Cloudbreak member.

[217] *MetCap Secs. LLC v. Pearl Senior Care, Inc.*, 2007 WL 1498989, at *6 (Del. Ch. May 16, 2007) (citing *Palese*, 2006 WL 1875915, at *5); *see also Stein v. Wind Energy Hldgs.*, 2022 WL 17590862, at *9 (Del. Super. Dec. 13, 2022) (dismissing an unjust enrichment claim where it was "not reasonably conceivable that [the defendant] benefitted from anything the [p]laintiffs did" because the plaintiffs were "not essential to the merger").

[218] *Coretel*, 2022 WL 2903104, at *11 (emphasis added); *see also MetCap*, 2007 WL 1498989, at *6 ("A showing that the defendant was enriched unjustly by the plaintiff who acted for the defendant's benefit is essential.").

Nothing of the sort is pleaded in the Complaint. The only action cited is the plaintiffs' consent to the Cloudbreak BCA.[219] But "[i]t is not enough that the defendant[s] received a benefit from the activities of the plaintiff[s]."[220]

Because the plaintiffs have not established all elements of their unjust enrichment claim, it is dismissed.

## III. CONCLUSION

The defendants' motions to dismiss are granted. The court lacks personal jurisdiction over Continental, requiring the dismissal of Count IV in full and Count VIII as to Continental. Count II is dismissed for lack of standing. Counts I, III, V, and VII (in part) are dismissed as untimely. Count VI, the remainder of Count VII, and Count VIII are dismissed for failure to state a claim.

This case is dismissed with prejudice.

---

[219] *See* Pls.' Answering Br. 63. The plaintiffs also say that Edwards benefitted Katz by voting for the transaction in his capacity as a Cloudbreak Board member. *Id.* Edwards is not suing in that capacity.

[220] *MetCap*, 2007 WL 1498989, at *6 (quoting *Michele Pommier Models, Inc. v. Men Women N.Y. Model Mgmt., Inc.*, 14 F. Supp. 2d 331, 338 (S.D.N.Y.1998), *aff'd*, 173 F.3d 845 (2d Cir. 1999)).